130 F.3d 731
 45 ERC 1582, 28 Envtl. L. Rep. 20,243
 WASTE MANAGEMENT, INC. OF TENNESSEE, Plaintiff-Appellant/
Cross-Appellee,
v.
METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY,
Defendant-Appellee/Cross-Appellant.
 Nos. 95-5863, 95-5900.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 6, 1996.
Decided Nov. 5, 1997.
 
 John M. Gillum (argued and briefed), Manier, Herod, Hollabaugh & Smith, Nashville, Tennessee, William L. Penny, Stephanie M. Jennings (briefed), Manier, Herod, Hollabaugh & Smith, Nashville, Tennessee for Appellant.
 Stephen Nunn (argued and briefed), The Metropolitan Government of Nashville & Davidson County Department of Law, Nashville, Tennessee, for Appellee.
 Before: CONTIE, BOGGS, and NORRIS, Circuit Judges.
 OPINION
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 Plaintiff, Waste Management, Inc. of Tennessee ("WMIT"), appeals the district court's denial of its motion for injunctive relief from enforcement of a flow control regulation and an ordinance which requires that all waste delivered to certain disposal facilities in passenger vehicles and pickup trucks be accepted either free of charge or for five dollars per load, respectively. Both the flow control regulation and the passenger vehicle and pickup truck ordinance were enacted by defendant, Metropolitan Government of Nashville and Davidson County ("Metro"). Defendant cross-appeals the district court's ruling that its waste disposal fee ordinances and their implementing regulation violate the Commerce Clause. We reverse in part and affirm in part.
 
 I.
 
 2
 The parties have stipulated to the facts relevant to this case. Defendant Metro is the local governing authority of Nashville and Davidson County, Tennessee. Between January 1991 and May 1994, defendant promulgated three classes of ordinances and regulations governing the disposal of solid waste generated within its boundaries. First, the flow control regulation and one of two amendments thereto ("flow control provisions") require that all persons collecting, hauling, or removing waste from Metro be licensed; that the waste be disposed of only at sites approved by Metro; and that all residential waste collected within Metro be disposed of at a waste-to-energy facility owned by Metro and operated by the Nashville Thermal Transfer Corp. ("NTTC").[1] NTTC supplies power to buildings in downtown Nashville with the energy it generates by burning solid waste. The amended regulation does not require that non-residential waste collected within Metro be disposed of at NTTC, unless that facility has not received the 6,300 tons of solid waste per week it needs to operate.
 
 
 3
 Second, the waste disposal fee ordinances and their implementing regulation ("waste disposal fee provisions") require that NTTC charge a tip fee of thirty-six dollars per ton, and that all collectors pay Metro a waste disposal fee of eight dollars per ton of waste dumped at sites other than NTTC.[2] This fee must be paid by any collector operating a facility within Metro for waste collected within Metro, and by any collector collecting such waste and disposing of it outside of Metro. Finally, the passenger vehicle and pickup truck ordinance requires that all waste collectors operating disposal facilities within Metro accept waste delivered by passenger vehicles free of charge,[3] and that such collectors accept waste delivered by standard pickup trucks for a fee of five dollars per load.[4] This ordinance does not apply to NTTC because that facility does not accept deliveries from passenger vehicles or pickup trucks.
 
 
 4
 Plaintiff is one of several waste collectors licensed to collect and dispose of waste within the boundaries of Metro, but it is the only collector which actually operates a waste disposal facility in Metro. The other licensed collectors include Browning-Ferris Industries of Tennessee, Inc. ("BFI") and Sanifill. Each of these collectors dispose of waste differently. Before it opened NTTC, Metro operated a landfill known as the Bordeaux Landfill in Davidson County. Plaintiff, on the other hand, operates a transfer station in Davidson County and landfills in both Benton County, Tennessee and Logan County, Kentucky. Because BFI does not have a transfer station, it brings waste directly to its landfill in Rutherford County, Tennessee, and Sanifill brings waste to NTTC, plaintiff's transfer station, or BFI's landfill.
 
 
 5
 In its amended complaint, plaintiff sought declaratory and injunctive relief against defendant, alleging that the flow control and waste disposal fee provisions violate the Commerce Clause of the United States Constitution, U.S. Const. art. I, § 8, cl. 3. Plaintiff later amended its complaint again, adding a claim that defendant's passenger vehicle and pickup truck ordinance constituted a taking without just compensation in violation of the Fifth Amendment to the United States Constitution.
 
 
 6
 The district court permanently enjoined enforcement of the waste disposal fee provisions, but did not enjoin enforcement of the flow control provisions, or the passenger vehicle and pickup truck ordinance. Both parties filed timely notices of appeal as to those portions of the district court's order which were adverse to their respective positions.
 
 II.
 
 7
 Jurisdiction before this court is premised upon 28 U.S.C. § 1292(a)(1). We review a district court's decision to grant or deny a motion for a permanent injunction for abuse of discretion, accepting the court's findings of fact unless they are clearly erroneous. Loschiavo v. City of Dearborn, 33 F.3d 548, 553 (6th Cir.1994). "An abuse of discretion exists when the district court applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." First Tech. Safety Sys., Inc. v. Depinet, 11 F.3d 641, 647 (6th Cir.1993).
 
 A. Commerce Clause
 
 8
 The United States Constitution expressly authorizes Congress to "regulate Commerce with foreign Nations, and among the several States," U.S. Const. art. I, § 8, cl. 3, and "the 'negative' or 'dormant' aspect of the Commerce Clause prohibits the States from 'advanc[ing] their own commercial interests by curtailing the movement of articles of commerce, either into or out of the state.' " Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources, 504 U.S. 353, 359, 112 S.Ct. 2019, 2023-24, 119 L.Ed.2d 139 (1992) (quoting H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 535, 69 S.Ct. 657, 663, 93 L.Ed. 865 (1949)); see also Ferndale Lab., Inc. v. Cavendish, 79 F.3d 488, 492 (6th Cir.1996). The negative Commerce Clause also limits the actions of municipalities such as Metro, where such actions "burden interstate commerce or impede its free flow." C & A Carbone, Inc. v. Clarkstown, 511 U.S. 383, 389, 114 S.Ct. 1677, 1681-82, 128 L.Ed.2d 399 (1994).
 
 
 9
 In deciding if a particular law violates the negative Commerce Clause, a court must first "determine whether [the law] 'regulates evenhandedly with only incidental effects on interstate commerce, or discriminates against interstate commerce.' " Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of Oregon, 511 U.S. 93, 99, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994) (quoting Hughes v. Oklahoma, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979)) (internal quotation marks omitted). A law that discriminates against interstate commerce treats in-state and out-of-state interests differently, benefitting the former and burdening the latter. Oregon Waste, 511 U.S. at 99, 114 S.Ct. at 1350.
 
 
 10
 If a law discriminates against interstate commerce, it is "virtually per se invalid," id., unless "the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." Carbone, 511 U.S. at 392, 114 S.Ct. at 1683. On the other hand, "nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.' " Oregon Waste, 511 U.S. at 99, 114 S.Ct. at 1350 (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)); see also City of Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535-36, 57 L.Ed.2d 475 (1978).
 
 1. Flow Control Provisions
 
 11
 Plaintiff argues that the district court erred in ruling that defendant's flow control provisions do not violate the Commerce Clause. The court held that the provisions are nondiscriminatory, with incidental effects on interstate commerce, and that the burden they impose is not clearly excessive in relation to their putative local benefits. It distinguished this case from Carbone on the grounds that the provisions at issue here do not totally exclude disposal of waste outside of Metro, or create or result in a monopoly for NTTC. Rather, the court reasoned, plaintiff can still dispose of non-residential waste at facilities other than NTTC that are located outside of Metro or even outside of Tennessee.
 
 
 12
 Before the court concluded that defendant's flow control provisions do not discriminate against interstate commerce, it proceeded as if they do discriminate. In considering whether defendant had any other means of advancing a legitimate local interest, the court again distinguished these provisions from those at issue in Carbone, on the ground that they do not just generate revenues, which would not be a legitimate local interest justifying such discrimination. 511 U.S. at 393, 114 S.Ct. at 1683-84. They also "implicate[ ] significant public environmental interests," such as ensuring that a proportion of solid waste collected within Metro's boundaries is used as fuel, and enabling Metro to comply with Tennessee's Solid Waste Management Act of 1991, Tenn.Code Ann. §§ 68-211-801-874, which requires municipalities to reduce by twenty-five percent the volume of solid waste disposed of in landfills and incinerators in Tennessee.
 
 
 13
 In Carbone, the Supreme Court stated that the flow control ordinance at issue there "hoard[ed] solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility." 511 U.S. at 392, 114 S.Ct. at 1683. The provisions at issue in this case do the same, even though they do not require that all waste be sent to NTTC. They require that all residential waste be sent to NTTC, thereby preventing plaintiff from disposing of such waste at a cheaper facility, and threatening the well-being of plaintiff's own dump sites. In Wyoming v. Oklahoma, 502 U.S. 437, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992), the Supreme Court observed that "[t]he volume of commerce affected measures only the extent of the discrimination; it is of no relevance to the determination whether a State has discriminated against interstate commerce." Id. at 455, 112 S.Ct. at 801. As we read Wyoming, plaintiff's ability to send some waste to facilities other than NTTC goes to the extent of the discrimination, not whether there was discrimination in the first place.
 
 
 14
 Having determined that defendant's flow control provisions do in fact discriminate against interstate commerce, we must now decide whether "the municipality [has] demonstrate[d], under rigorous scrutiny, that it has no other means to advance a legitimate local interest." Carbone, 511 U.S. at 392, 114 S.Ct. at 1683. Although defendant may have cited two legitimate local interests, there are other means of advancing such interests, like charging competitive tipping fees for waste disposed of at NTTC. Moreover, Metro concedes that it could secure a flow of waste to NTTC by increasing its collections either directly or by contract, "but this could not be done without legislation and some further time for preparation." Because defendant's flow control provisions are facially discriminatory, and because there are other means of advancing the legitimate local interests cited, these provisions cannot satisfy the rigorous scrutiny to which such laws are subjected under the Commerce Clause. We hold, therefore, that the district court erred in refusing to enjoin their enforcement.
 
 2. Waste Disposal Fee Provisions
 
 15
 Defendant cross-appeals the district court's decision to permanently enjoin enforcement of its waste disposal fee provisions, arguing that the court erred in concluding that they violate the Commerce Clause. We agree with the district court's conclusion that the provisions in question are facially discriminatory, since they treat Metro and non-Metro interests differently. Examples of such differential treatment are the fact that the fee is not imposed upon waste disposed of at NTTC or any other Metro-owned facility, and that it is only imposed upon plaintiff and BFI, both of whom dispose of waste at facilities outside of Metro's boundaries. Once the court found the fee to be facially discriminatory, it was per se invalid, unless Metro could demonstrate that it had no other means of advancing a legitimate local interest. Carbone, 511 U.S. at 392, 114 S.Ct. at 1683.
 
 
 16
 The district court properly rejected defendant's argument that the fee is a compensatory tax which compensates Metro for "the overall cost of solid waste management in Davidson County," since Metro did not offer any evidence of a specific tax burden on intrastate commerce for which it sought compensation. See Oregon Waste, 511 U.S. at 102-03, 114 S.Ct. at 1351-52. Not only did Metro fail to demonstrate that it had no other means of advancing a legitimate local interest, both parties acknowledged that there was a reasonable nondiscriminatory alternative in the form of a generator or container tax on all residential and non-residential waste generated within Metro's boundaries. The district court did not abuse its discretion in permanently enjoining enforcement of defendant's waste disposal fee provisions.
 
 B. Takings Clause
 
 17
 The Takings Clause of the Fifth Amendment provides, in relevant part, "... nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The primary purpose of the Takings Clause is to prevent the government from requiring certain individuals to bear burdens which should be borne by society as a whole. Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 123-24, 98 S.Ct. 2646, 2658-59, 57 L.Ed.2d 631 (1978); see also In re Blue Diamond Coal Co., 79 F.3d 516, 524 (6th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 682, 136 L.Ed.2d 608 (1997). The Supreme Court has recognized two categories of takings: regulatory and physical. See, e.g., Penn Central, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (holding prohibition on construction of fifty-five-story office tower over New York's Grand Central Terminal is not a regulatory taking); Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (holding cable equipment occupying one and one-half cubic feet of private building is a physical taking).
 
 1. Regulatory Taking
 
 18
 The Supreme Court has declined to lay out a set formula for determining whether a regulatory taking has occurred, preferring instead to engage in "essentially ad hoc, factual inquiries." Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992) (quoting Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659). The Court has, however, identified several factors which have "particular significance" in determining whether there has been a taking, namely 1) the character of the governmental action; 2) the economic impact of the regulation on the claimant; and 3) the extent to which the regulation has interfered with the claimant's distinct investment-backed expectations. Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 224-25, 106 S.Ct. 1018, 1025-26, 89 L.Ed.2d 166 (1986) (citing Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659); see also Blue Diamond Coal, 79 F.3d at 524.
 
 2. Physical Taking
 
 19
 A physical taking, on the other hand, occurs where the government physically intrudes upon a plaintiff's property. "[A] permanent physical occupation is a government action of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine." Loretto, 458 U.S. at 432, 102 S.Ct. at 3174. If, in other words, the "character of the governmental action" is a permanent physical occupation of property, then the Supreme Court "uniformly [has] found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." Id. at 434-35, 102 S.Ct. at 3175.
 
 
 20
 3. Passenger Vehicle and Pickup Truck Ordinance
 
 
 21
 Plaintiff argues that the district court erred in ruling that defendant's passenger vehicle and pickup truck ordinance does not violate the Fifth Amendment, but fails to articulate exactly which kind of taking it believes the ordinance causes. Plaintiff did argue to the district court that the ordinance amounts to an invasion and taking of its property because it was required to designate an area on plaintiff's property specifically for receiving waste from passenger cars and pickup trucks. The district court rejected this argument, concluding that plaintiff "has not suffered an easement equivalent to permanent physical occupation of the property" in part because it "is in the business of collecting and disposing of solid waste and, therefore, its physical plants already have the physical modifications required to receive and process such waste." According to the court, the requirements are justifiable intrusions that serve the legitimate state interest of efficient and timely collection and disposal of solid waste.
 
 
 22
 In determining whether the district court erred when it ruled that defendant's ordinance does not cause a physical taking, we must decide whether the character of the governmental action constitutes a permanent physical occupation of plaintiff's property. Loretto, 458 U.S. at 432, 102 S.Ct. at 3174. If so, defendant's action is a taking "without regard to other factors that a court might ordinarily examine," id., and "without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." Id. at 434-35, 102 S.Ct. at 3175.
 
 
 23
 As one measure of the burden placed upon it by the ordinance, plaintiff points to documents in the record indicating that Metro's Bordeaux Landfill received approximately 50,000 tons of waste from passenger vehicles and pickup trucks in 1989 (the landfill was closed in 1994). Should defendant's ordinance be enforced, plaintiff alone will have to be equipped to accept all waste delivered by passenger vehicles and pickup trucks--regardless of how much there is, and regardless of the capacity of its facility--since plaintiff's facility is the only one located within Metro's boundaries that will accept such waste. In addition, the parties stipulated that plaintiff will have to do the following in order to comply fully with defendant's ordinance: (1) allot approximately one-half acre of its nine-acre property to accommodate these services; (2) prepare that designated area with a concrete pad and drains; (3) place containers on that area to receive the waste; (4) physically receive the solid waste; (5) hire personnel and designate equipment to handle such waste; (6) allow access to the property to passenger vehicles and pickup trucks; (7) accept, process, transport and dispose of the waste; and (8) incur the financial costs of accepting, processing, transporting and disposing of the waste at an uncompensated or undercompensated rate.
 
 
 24
 The stipulations appear to recognize that it is not feasible, either from a safety or economic standpoint, to serve both commercial and non-commercial vehicles in the very same area. If what is being required of plaintiff is that it involuntarily set off and improve a portion of its property for the accommodation of passenger cars and pickup trucks to the exclusion of all other uses, then it seems to us that the effect of defendant's conduct in pursuing its interests is tantamount to defendant's physical occupation of plaintiff's property. However, it is not clear to us from the wording of the stipulated facts that this exclusive dedication of a portion of the property is what is actually being required of plaintiff.
 
 
 25
 Should the district court conclude on remand that defendant's ordinance did in fact cause a physical taking of plaintiff's property, then it follows under Loretto that plaintiff would be entitled to relief regardless of the otherwise legitimate state interest advanced by Metro. 458 U.S. at 434-35, 102 S.Ct. at 3175-76.
 
 4. Ripeness
 
 26
 There is, however, one more issue to consider, namely, whether plaintiff complied with the Supreme Court's holding in Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), thereby rendering its taking claim ripe for adjudication in federal court.
 
 
 27
 In Williamson, the Supreme Court held that the Takings Clause "does not proscribe the taking of property; it proscribes taking without just compensation." Id. at 194, 105 S.Ct. at 3120. Thus, where a state provides an adequate procedure for seeking just compensation, a property owner cannot claim the Takings Clause has been violated until he has used the procedure and been denied just compensation. Id. at 195, 105 S.Ct. at 3121. In Williamson, the Court examined Tennessee law and concluded that a property owner in that state could bring an inverse condemnation action to obtain just compensation for an alleged taking of property under certain circumstances. Because the landowner in Williamson had not shown that the procedure was unavailable or inadequate, and had not utilized it, the Court concluded that the taking claim before it was premature.
 
 
 28
 This case, of course, comes to us from Tennessee. Because the ripeness issue was not addressed by the district court, and we are unable to say whether applicable Tennessee law in effect at the relevant time afforded plaintiff an adequate procedure to seek compensation or whether plaintiff utilized it prior to filing his claim in federal court, we must call upon the district court to address the ripeness issue on remand.
 
 III.
 
 29
 We reverse that portion of the district court's order which denies plaintiff's motion for injunctive relief from enforcement of the flow control provisions, and we affirm that portion of the court's order that grants plaintiff's motion for injunctive relief from enforcement of the waste disposal fee provisions. Finally, we vacate that portion of the court's order that denies plaintiff's motion for relief from enforcement of the passenger vehicle and pickup truck ordinance, and remand this cause to the district court for further proceedings consistent with this decision.
 
 
 
 [1]
 The flow control provisions read, in relevant part, as follows:
 (e) Unless otherwise specifically authorized in writing by the Director [of the Department of Public Works], all residential Solid Waste collected within the boundaries of the Metropolitan Government shall be disposed of at the Nashville Thermal Transfer Corporation (NTTC). Non-residential Solid Waste is not required to be disposed of at the NTTC unless designated for disposal there pursuant to the following procedure:
 (1) Any Collector of Solid Waste collected within the boundaries of the Metropolitan Government shall report the amount of residential and non-residential Solid Waste collected each month and the amounts of Solid Waste delivered to each Final Disposal Point and/or Intermediate Disposal Point....
 (2) At least quarterly, the Department of Public Works shall calculate a pro rata estimate of the amount of non-residential Solid Waste collected by each Collector, using the best available data.
 (3) The NTTC shall notify the Director, at least two (2) weeks in advance, of its estimated need for Solid Waste for each operating day of the corresponding week. The Department of Public Works shall notify each Collector, at least one (1) week in advance, of its estimated pro rata share of Solid Waste, which may include an amount of non-residential Solid Waste if any, necessary for disposal at the NTTC for the following week....
 Public Works Regulation on Collection and Disposal of Solid Waste, Amendment No. 2 (added to Section II of the Regulation ).
 
 
 [2]
 The waste disposal fee provisions read, in relevant part, as follows:
 All metropolitan government sanitary landfills, incinerators or other collection stations shall have tip fees established and all persons shall pay a tip fee of nine dollars per cubic yard or thirty six dollars per ton of loose or compacted refuse, effective November 1, 1993; and all persons shall pay a tip fee of eleven dollars per cubic yard or forty-four dollars per ton of loose or compacted refuse effective January 1, 1995.
 Ordinance No. 093-821, Section 5 (amending Section 10.20.200 of the Metropolitan Code of Laws by deleting the existing language in its entirety and substituting this language).
 Any person enjoying the privilege of providing temporary or permanent disposal of solid waste generated or collected within the boundaries of the metropolitan government at a site or facility located within the boundaries of the metropolitan government; or enjoying the privilege of collecting solid waste within the boundaries of the metropolitan government and disposed of outside the boundaries of the metropolitan government; shall pay to the metropolitan government a fee of $2.00 per cubic yard or $8.00 per ton of solid waste or special waste accepted into the site or facility or collected within the boundaries of the metropolitan government and disposed of outside said boundaries....
 Ordinance No. 094-1063, Section 1 (amending Section 11A of Ordinance No. 093-821 by deleting the existing language in its entirety and substituting this language).
 
 
 [3]
 The portion of the passenger vehicle and pick-up truck ordinance that concerns passenger vehicles reads as follows:
 Any person enjoying the privilege of providing temporary or permanent disposal of solid waste pursuant to this chapter shall provide without charge sufficient containers at or near the entrance for the use of persons in passenger cars disposing of such waste.
 Ordinance No. 093-821, Section 9 (added to Section 10.20.260 of the Metropolitan Code of Laws).
 
 
 [4]
 The portion of the passenger vehicle and pick-up truck ordinance that concerns pick-up trucks reads as follows:
 Any person enjoying the privilege of providing temporary or permanent disposal of solid waste pursuant to this chapter shall accept waste from private standard pickup trucks at a fee of five dollars per load. No fee shall be paid to the metropolitan government, but a full monthly accounting as to weight, volume and number of trucks shall be furnished to the metropolitan government upon request.
 Ordinance No. 093-821, Section 11B (added to Article II of Chapter 10.20 of the Metropolitan Code of Laws as Section 10.20.330, re-numbering the existing Section 10.20.330 as Section 10.20.350).