*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2001 FED App. 0152P (6th Cir.)
File Name:  01a0152p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MAHARG, INC.,
      *Plaintiff-Appellant,*

    *v.*

VAN WERT SOLID WASTE
MANAGEMENT DISTRICT;
GARY D. ADAMS, Chairman
of the Board Van Wert Solid
Waste Management District;
AVA K. GOOD, Director of
Van Wert Solid Waste
Management District; GARY
D. COOPER, Director of Van
Wert Solid Waste
Management District,
      *Defendants-Appellees.*

No. 99-4035

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No.  99-07245—James G. Carr, District Judge.

Argued:  December 5, 2000

Decided and Filed:  May 7, 2001

Before:  MERRITT, NELSON, and BATCHELDER,
              Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  Kevin N. McMurray, FROST & JACOBS, Cincinnati, Ohio, for Appellant. Albin Bauer, II, EASTMAN & SMITH, Toledo, Ohio, for Appellees. **ON BRIEF:** Kevin N. McMurray, Christopher S. Habel, FROST & JACOBS, Cincinnati, Ohio, for Appellant.  Albin Bauer, II,  Henry N. Heuerman, EASTMAN & SMITH, Toledo, Ohio, for Appellees.

_____

**OPINION**

_____

    DAVID A. NELSON, Circuit Judge.   The question presented in this appeal is whether the constitutional rights of the plaintiff, an Ohio corporation engaged in the business of solid waste collection and disposal, were violated by waste processing restrictions imposed under Ohio law by the county where the waste originated.  The restrictions in question precluded the plaintiff from continuing to dispose of the waste at an Indiana landfill the operator of which had declined to meet the county's conditions for designation of the landfill as an approved disposal site  –  conditions that included execution of a standard-form agreement to collect a prescribed per-ton surcharge and remit it to the county.

    In a decision reported at 60 F.Supp.2d 750 (N.D. Ohio 1999), the district court dismissed the action under Rule 12(b)(6), Fed. R. Civ. P.  We shall affirm the dismissal.

I

The plaintiff, Maharg, Inc., collects solid waste from residential, commercial and industrial customers of which some 400 are located in Northwestern Ohio's Van Wert County. Prior to April of 1999 Maharg patronized a sanitary landfill located in an adjacent jurisdiction – Jay County – in Indiana. All of the waste that Maharg collected in Van Wert County was hauled to the Jay County facility for disposal.

Defendant Van Wert Solid Waste Management District is a public entity formed pursuant to Chapters 343 and 3734 of the Ohio Revised Code. The district has boundaries that are coterminous with those of Van Wert County, and the entity is headed by a board of directors made up of the members of the county's board of commissioners. (For the sake of convenience, we shall use the terms "district" and "county" interchangeably in this opinion.)

The district maintains a solid waste management plan pursuant to Ohio Rev. Code § 3734.54. As permitted by Ohio Rev. Code § 3734.53(E)(1), the plan states that the board is authorized to make "facility designations" under Ohio Rev. Code § 343.014. The effect of this statement, under the latter section of the code, is to allow the board to "designate solid waste disposal, transfer, or resource recovery facilities . . . where solid wastes generated within or transported into the district shall be taken for disposal . . . ." Ohio Rev. Code § 343.014(A). It is through such facility designations that the board conducts what Maharg refers to as "flow control."

Ohio Rev. Code § 343.014 contains detailed procedural requirements for making solid waste facility designations. The process begins with adoption of a resolution in which the board expresses an intent to designate such facilities. See Ohio Rev. Code § 343.014(B). The Van Wert board adopted a resolution of this type on August 6, 1998.

The board's resolution included a request for the submission of proposals by operators of solid waste facilities in the Northwestern Ohio-Northeastern Indiana area. The request explained, among other things, that each successful designee would be required to execute a "designation agreement" obligating the designee to collect a "contract fee" of $5.30 for each ton of solid waste generated within the district and delivered to the designated facility. The resolution further explained that these fees – which were to be remitted to the district monthly – had been set at a level determined "on the basis of anticipated financial need of the District in implementing the Plan and enforcing compliance with facility designations."

Copies of the request for proposals were sent to the operators of 13 solid waste facilities considered to be within a reasonable distance. (Eleven of these facilities are in Ohio and two are in Indiana.) The board also published notice of the request for proposals in Ohio and Indiana newspapers.

On August 27, 1998, the board opened sealed bids submitted in response to its solicitation. The board then adopted a resolution notifying the public that it proposed to designate six solid waste facilities – four in Ohio and two in Indiana – as the only facilities authorized to receive waste generated within the district. The first of the facilities so identified was the one Maharg had been using – the Jay County landfill in Portland, Indiana. That facility is operated by Jay County Landfill, Inc., an affiliate of the Waste Management organization.

On September 8, 1998, after an opportunity for public comment, the board adopted a resolution designating four solid waste facilities – two in Ohio and two in Indiana – as the facilities authorized to receive waste generated in Van Wert County. The designations, which were subject to the execution of designation agreements by the facilities' owners or operators, named the Jay County landfill as one of the approved facilities.

Maryland did not violate the Due Process Clause by its outright prohibition of the operation of retail gasoline stations by integrated oil companies – and the Supreme Court had "no hesitancy" in rejecting the integrated oil companies' due process challenge to the Maryland statute, see *Exxon*, 437 U.S. at 124 – it follows *a fortiori* that we should have no hesitancy in rejecting Maharg's due process challenge to the Van Wert County scheme. And, in point of fact, we have none.

The district court's judgment of dismissal is **AFFIRMED**.

arbitrarily exclude anyone from the RFP process; on the contrary, as we have seen, the county went out of its way to encourage the widest possible participation. It is not Van Wert County's fault that Maharg did not happen to own a waste disposal facility – that Maharg, in other words, was not situated similarly to haulers that did own such facilities – and the county obviously did not violate Maharg's equal protection rights.

C

Section 1 of the Fourteenth Amendment also provides that no state may "deprive any person of life, liberty, or property, without due process of law." It has come to be understood that this provision has a "substantive" component under which "a state or local legislative measure is judicially voidable on its face if it necessarily compels results in all cases which are 'arbitrary and capricious, bearing no relation to the police power.'" *Sam & Ali, Inc. v. Ohio Dep't of Liquor Control*, 158 F.3d 397 (6th Cir. 1998) (quoting *Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 676 (1976)).

The power to provide by legislation for safe and sanitary management of solid waste is obviously a "police power." Van Wert County's waste management scheme bears an obvious relation to this police power. Maharg contends that the county was being "arbitrary and capricious" in the adoption of its waste management scheme, but the contention, as far as we can see, is utterly devoid of merit.

Reasonable people might question the wisdom of the particular method chosen by Van Wert County to protect the health and welfare of its citizens insofar as the management of their solid waste is concerned. It is, nonetheless, "absolutely clear that the Due Process Clause does not empower the judiciary 'to sit as a "superlegislature to weigh the wisdom of legislation" . . .'" *Exxon*, 437 U.S. at 124, (quoting *Ferguson v. Skrupa*, 372 U.S. 726, 731 (1963)). If

The designation of the Jay County landfill was rescinded by resolution adopted on November 24, 1998. The reason for the recission, the resolution explained, was that "Jay County Landfill, Inc. has informed the Solid Waste District that it will not enter into a designation agreement with the District nor will it participate in any re-bid of the District's facility designations."

With only three facilities now on the approved list, the board decided to issue a second request for proposals. In an apparent effort to promote wider participation on the part of prospective designees, the board dispensed with an earlier requirement for price-per-ton bids.

Copies of the second request for proposals were sent to the operators of 15 solid waste facilities, including the Jay County landfill operator. Jay County Landfill, Inc., did not submit a bid, but bids were received from the operators of eight other facilities.[1] Two of these facilities are located in Van Wert County,[1] five are located elsewhere in Ohio, and one is located in Fort Wayne, Indiana.

On January 15, 1999, the board adopted a resolution proposing to include all eight facilities on the list of designees. Public comment was again invited.

Maharg's lawyers sent the board a letter expressing strong opposition to the proposed designation. Among other things, the letter contended that "[b]y authorizing only one facility outside of the State of Ohio to accept Van Wert County generated waste, the District's proposed designation violates the Commerce Clause of the U.S. Constitution . . . ." Among the cases cited in support of this proposition was *C&A Carbone, Inc. v. Town of Clarkstown, New York*, 511 U.S. 383 (1994).

---

[1] There are no sanitary landfills in Van Wert County, but at least two transfer facilities – one owned by the county itself – are located within the county.

The board was evidently unpersuaded. On February 18, 1999 – the same day on which Maharg's letter was transmitted to the board by facsimile – the board adopted a resolution designating the eight facilities as the only ones authorized to receive solid waste generated within the district. As before, the designations were subject to the execution of acceptable designation agreements. The resolution further provided as follows:

"On and after April 20, 1999, pursuant to [Ohio Rev. Code] section 343.01(I)(2), no person shall deliver, or cause the delivery of, any 'Solid Waste' generated within the District, as defined in the second RFP, to any solid waste facility other than the [eight] designated facilities . . . ."

From and after April 20, 1999 – absent a waiver granted under Ohio Rev. Code § 343.01(H)(2)[2] – Maharg would have been subject to a fine of not more than $5,000 per day had it continued to use the Jay County landfill as a disposal site for solid waste generated in Van Wert County. See Ohio Rev. Code § 343.99. Maharg promptly brought suit against the district and the members of its board of directors, alleging that the defendants had imposed an impermissible restriction on the free flow of interstate commerce in violation of Maharg's constitutional and civil rights. Maharg's verified complaint, which set forth the facts summarized above, concluded with a prayer for declaratory, injunctive, and monetary relief.

---

[2]Section 343.01(H)(2) provides in part that "[u]pon the request of a person . . . the board of county commissioners of a county district . . . may grant a waiver authorizing the delivery of all or any portion of the solid wastes generated in a municipal corporation or township to a . . . facility other than the facility designated under section 343.013 . . . ." Maharg acknowledges that it never requested a waiver, but suggests that it would have been a vain act to do so.

to support Maharg's claim that the burden is "excessive" in comparison to the supposed local benefits of the scheme.

It is no answer that the existence of the scheme, coupled with Jay County Landfill's refusal to meet the county's conditions for designation as an approved disposal facility, worked a change in the solid waste market structure and ended a flow of interstate commerce from Van Wert County, Ohio, to Jay County, Indiana. The "notion that the Commerce Clause protects the particular structure or methods of operation in a [given] market" is a notion that has been squarely rejected by the Supreme Court. See *Exxon*, 437 U.S. at 127.

                              B

The first section of the Fourteenth Amendment provides, among other things, that no state shall "deny to any person within its jurisdiction the equal protection of the laws." This, the Supreme Court has told us, "is essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).

Maharg contends that although its situation is similar to that of other solid waste haulers operating in Van Wert County, Maharg has been treated differently from the other haulers. It has been treated differently, Maharg says, because other waste haulers owned or controlled their own transfer stations and/or disposal facilities, and were thus in a position to participate directly in the county's facility designation process. Maharg, in contrast, was "excluded from the [Request for Proposals] process" and was left to the tender mercies of facility owners (Jay County Landfill, *e.g.*) that could decline to participate on a "whim."

Merely to state such an argument is to come close to refuting it. The process of designating approved facilities must, in the nature of things, be directed to those who have facilities in the first place. Van Wert County did not

3

This brings us to the question whether the Van Wert County scheme, if non-discriminatory, should nonetheless be found to run afoul of the Commerce Clause on the ground that it "imposes a burden on interstate commerce that is clearly excessive in relation to the putative local benefits." *C&A Carbone*, 511 U.S. at 390 (citation and internal quotes omitted). We are satisfied that the scheme imposes no such impermissible burden.

The "putative local benefits" of the Van Wert County scheme are obvious from the complaint and its attachments, all of which must be read in the light of the pertinent provisions of the Ohio Revised Code. The scheme was devised as a means of providing for "the safe and sanitary management of [the county's] solid wastes" in accordance with Ohio Rev. Code § 3734.52(A). The first of the series of resolutions mentioned in Part I of this opinion explains that Van Wert County's solid waste management plan, which was approved by the Director of the Ohio Environmental Protection Agency, "provides for the [county's] implementation of numerous solid waste management activities designed to achieve the State of Ohio's objectives for solid waste recycling, reuse, and minimization." The resolution further explains that the county decided to set the per-ton contract fee at $5.30 with a view to covering the costs of "implementing the Plan and enforcing compliance with facility designations." The "safe and sanitary management" of solid waste generated within the county, in other words, is to be conducted on a self-financing basis.

We have no quarrel with Maharg's submission that the operation of the scheme places a burden upon interstate commerce. But neither do we have any reason to doubt that the burden is in line with the cost of ensuring safe and sanitary management of the county's output of solid waste. The facts well pleaded in the complaint fail as a matter of law

The defendants demurred to the complaint, moving for dismissal pursuant to Rule 12(b)(6), Fed. R. Civ. P. The district court granted the motion. See 60 F.Supp.2d at 755. This appeal followed.

II

Maharg's principal argument on appeal is that Van Wert County's prohibition against disposal of solid waste at any landfill the operator of which has not sought and obtained a facility designation from the county and has not agreed to collect and remit the $5.30 per-ton contract fee violates the negative implications (the so-called "dormant" aspect) of the Commerce Clause, U.S. Const. art. 1, § 8, cl. 3. Maharg further contends that the prohibition violates Maharg's rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment. (The complaint also asserted a state law claim for tortious interference with Maharg's contractual rights, but that claim appears to have been abandoned in the district court and is not pressed on appeal.) We shall address the constitutional arguments in the sequence in which Maharg has presented them to us.

A

1

Maharg's first line of attack under the Commerce Clause is based primarily on a passage from the opening paragraph of Part V of the plurality opinion in *Edgar v. Mite Corp.*, 457 U.S. 624 (1982). Speaking for himself and three other members of the Court, Justice White said there that "[t]he Commerce Clause . . . permits only *incidental* regulation of interstate commerce by the States; direct regulation is prohibited." *Id*. at 640.

Van Wert County's scheme constitutes a "direct regulation" of interstate commerce, Maharg submits, "because it expressly bans interstate trade with *any* of the thousands of undesignated landfills nationwide." As a "direct regulation"

of interstate commerce, Maharg contends, the Van Wert County scheme is prohibited regardless of any beneficent purpose that may underlie it.

Although there have been periods in our legal history when the constitutionality of state taxes or other measures burdening interstate commerce was thought to turn on the answer to the question whether the burden was "direct" or "indirect" (see, *e.g., Freeman v. Hewit*, 329 U.S. 249, 256 (1946)), that test now appears to have been repudiated for good – or at least for the present. See *Quill Corp. v. North Dakota*, 504 U.S. 298 (1992), where the Court explained that the earlier caselaw's "formal distinction between 'direct' and 'indirect' taxes on interstate commerce" – a distinction with an on-again-off-again history – had been rejected in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 281 (1977). *Quill*, 504 U.S. at 310. What is important, the Supreme Court now believes, is the "practical effect" of the challenged tax. *Quill, id*., quoting *Complete Auto*, 430 U.S. at 279.[3]

Looking at the practicalities of the case at hand, we find that while it may be true in a formalistic sense that Maharg is precluded from disposing of Van Wert County solid waste at "thousands of undesignated landfills nationwide," there is no reason to suppose that Maharg has the slightest interest in disposing of Van Wert County waste at any undesignated landfill other than the one it formerly patronized in nearby Jay County. The practical effect of Van Wert County's scheme – and what Maharg is really complaining about – is that the Jay County landfill has been put off limits for Van Wert

---

[3] Justice White himself read *Complete Auto* as repudiating more of the earlier understanding than his colleagues may have thought it did: "What we disavowed in Complete Auto," Justice White wrote in *Quill*, "was not just the formal distinction between 'direct' and 'indirect' taxes on interstate commerce . . . but also the whole notion . . . . that 'interstate commerce is immune from state taxation' . . . ." *Quill*, 504 U.S. at 323 (White, J., concurring in part and dissenting in part).

collected within the jurisdiction to be disposed of at a waste-to-energy facility owned by Metro itself. *Id*. at 733. The plaintiff was prohibited from disposing of such waste at a cheaper facility, and the ordinance represented precisely the kind of "simple economic protectionism" that was condemned by the Supreme Court in cases such as *Philadelphia*, *Oregon Waste,* and *C&A Carbone*. We held the ordinance unconstitutional on that basis, Metro not having demonstrated the unavailability of "other means to advance a legitimate local interest." *Metro Nashville*, 130 F.3d at 736 (quoting *C&A Carbone*, 511 U.S. at 392).

The *Metro Nashville* panel acknowledged that the challenged flow control ordinance did not require solid waste of commercial or industrial origin to be sent to the favored facility. *Metro Nashville*, 130 F.3d at 736. The fact that "all *residential* waste" was required to be sent there, however, was held to be a fatal defect. *Id*. The plaintiff's ability to send some waste to other facilities, the panel observed, "goes to the extent of the discrimination, not whether there was discrimination in the first place." *Id.*

Maharg seizes on the language last quoted as support for an assertion that the constitutionality of Van Wert County's solid waste scheme is not saved by the fact that the county has designated eight sites as approved disposal facilities, not just one. The number of approved facilities, according to Maharg, "only goes to the extent of the discrimination, not whether there was discrimination in the first place." But Maharg ignores the obvious fact that Van Wert County would have approved the Jay County landfill too if the operator of that landfill had been willing to sign the same kind of agreement that was signed by the operators of each of the eight approved facilities. The situation presented in the case at bar, unlike the situation in *Metro Nashville*, involves no discrimination in the first place.

from the major integrated oil companies, the local retailers were not being protected against competition from a small number of interstate companies that chose to engage solely in gasoline retailing. This circumstance, in the Court's judgment, "fully distinguish[ed]" *Exxon* from cases such as *Hunt v. Washington Apple Adver. Comm'n*. If any integrated oil companies had been based in Maryland, moreover, they would have been barred from the retail business just as every other producer-refiner was. This was "a most critical factor in *Exxon*," the Supreme Court subsequently suggested. See *Lewis v. BT Investment Mgrs., Inc.*, 447 U.S. 27, 42 (1980).

*Exxon* may not be dispositive of Maharg's "practical effect" argument, but it comes pretty close. At the very least, it seems to us, *Exxon* shows a willingness on the part of the Supreme Court to engage in some fairly fine slicing and dicing of the practical effects of state legislation in order to avoid the necessity of finding the legislation discriminatory. *Exxon* also manifests an obvious reluctance to push cases such as *Hunt v. Washington Apple Adver. Comm'n* to their logical extremes. And if a "most critical factor" in *Exxon* was that local producer-refiners would have been barred from the retail trade had any local producer-refiners been in existence, it would seem to be at least as critical, in the case at bar, that Maharg would not have been barred from disposing of Van Wert County waste in Jay County had the operator of the Jay County landfill been willing to sign a designation agreement containing the same terms as the agreements signed by the operators of other landfills.

Maharg submits that the discrimination question must be resolved against Van Wert County because of our decision in *Waste Management, Inc. of Tenn. v. Metropolitan Gov't of Nashville and Davidson Co.*, 130 F.3d 731 (6th Cir. 1997) (hereinafter cited as "*Metro Nashville*"). We find the submission unpersuasive.

At issue in *Metro Nashville* was a flow control ordinance that, among other things, required all residential solid waste

County waste because of the refusal of the operator of the Jay County facility to enter into a designation agreement obligating it to collect a $5.30 per ton contract fee (a tax, in economic effect) on behalf of Van Wert County.

The constitutionality of this $5.30 per ton burden on interstate commerce is not to be determined, as we see it, under the "direct/indirect" test. It is to be determined, rather, under a line of waste disposal cases that includes *Philadelphia v. New Jersey*, 437 U.S. 617 (1978); *Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334 (1992); *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources*, 504 U.S. 353 (1992); *Oregon Waste Systems, Inc. v. Dept. of Environmental Quality of the State of Oregon*, 511 U.S. 93 (1994); and *C&A Carbone, Inc. v. Town of Clarkstown, New York*, 511 U.S. 383 (1994).

The rule that has evolved in this line of cases is that the constitutionality of a municipal waste disposal ordinance affecting interstate commerce turns on "two lines of analysis: first, whether the ordinance discriminates against interstate commerce, *Philadelphia*, 437 U.S. at 624; and second, whether the ordinance imposes a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits,' *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)." *C&A Carbone*, 511 U.S. at 390. We address these lines of analysis in turn.

2

"The Commerce Clause presumes a national market free from local legislation that discriminates in favor of local interests." *C&A Carbone*, 511 U.S. at 393. The term "discrimination," in this context, "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste*, 511 U.S. at 99. Such differential treatment is normally equated with "simple economic protectionism" – and "a

virtually *per se* rule of invalidity has been erected with regard to such protectionism." *Philadelphia*, 437 U.S. at 624.

a

At issue in *Philadelphia* was a New Jersey statute which, with certain narrow exceptions, prohibited anyone from bringing into New Jersey "any solid or liquid waste which originated or was collected outside the territorial limits of the State . . . ." *Id*. at 618. Because this statute discriminated on its face against commerce in non-New Jersey waste, as contrasted with commerce in waste collected within the state, the Supreme Court held the statute to be in violation of the Commerce Clause.

Maharg suggests that the scheme adopted by Van Wert County likewise discriminates on its face against interstate commerce. Although the county's scheme allows solid waste generated within the county to be disposed of at any of seven Ohio landfills, Maharg complains in its opening brief on appeal, the scheme "restrict[s] solid waste exports to but one out-of-state landfill . . . ."

Unlike the restriction at issue in *Philadelphia*, however, the restriction imposed by Van Wert County is not territorially based. Maharg's complaint and the exhibits attached to it show that Maharg is not being forbidden to dispose of its Van Wert County waste at the Jay County landfill because that landfill is located in Indiana. The bidding process described in Part I above ignored county and state lines; the process was open on an equal footing to all potential facility designees, regardless of where they were located. The reason Maharg cannot dispose of its waste at the Jay County landfill has nothing to do with the landfill's Indiana situs. The reason, rather, is that the operator of this particular landfill – unlike the operator of the Fort Wayne landfill – ultimately declined to sign a designation agreement that would have obligated it to collect and remit the $5.30 per ton contract fee that Van Wert County insists on receiving from *every* solid waste

and people that have allegedly enabled it to enjoy economies of scale in hauling waste to Jay County would not appear to have been jeopardized by the surcharge as such. The surcharge may be an annoyance, but it is an equal-opportunity annoyance. It is not a protectionist measure burdening only the operators of foreign facilities.

But is there an impermissible discriminatory effect insofar as Maharg may have suffered a diminution of its alleged competitive advantage over Ohio competitors that have always operated solely intra-state? The county argues that *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978), compels us to answer this question "no."

In *Exxon* the Supreme Court upheld the constitutionality of a Maryland "divestiture" statute that flatly prohibited a producer or refiner of petroleum products from operating any retail gasoline service station within the state. Major oil companies such as Exxon were thus required to divest themselves of their direct retail gasoline operations in the State of Maryland. There did not happen to be any Maryland-based petroleum producers or refiners – a circumstance that made it plausible, to say the least, for Exxon and other major oil companies to argue, as they did, that the statute was unconstitutional because its effect was "to protect in-state independent dealers from out-of-state competition." *Exxon*, 437 U.S. at 125.

Plausible though the argument may have been, the Supreme Court rejected it. "[T]he fact that the burden of the divestiture requirements falls solely on interstate companies," the Court concluded, ". . . does not lead, either logically or as a practical matter, to a conclusion that the State is discriminating against interstate commerce at the retail level." *Id*.

The *Exxon* Court pointed out that the Maryland statute created no barriers against competition from interstate independent retailers – which is to say that although local Maryland retailers were being protected against competition

no reason to suppose that the movement of waste between the two states would be eliminated or severely impaired. The practical effect of every county's adopting the Van Wert model might well be an increase in the overall level of waste disposal costs, but we do not believe that this can fairly be equated with the balkanization the Commerce Clause is intended to prevent.

ii

In the second branch of its "practical effect" argument, Maharg contends that the restrictions imposed by Van Wert County deprived Maharg of the competitive advantage it had gained by utilizing the interstate market. Maharg says that it invested in larger trucks than its competitors did, hired more people than they, planned its routes better, and negotiated lower fees with the Jay County landfill. The Commerce Clause, Maharg contends, prevents Van Wert County from "stripping away" the resultant competitive advantage.

Maharg relies for this proposition on *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 351 (1977), where a North Carolina statute had the effect of requiring western apple growers to bring their marketing practices into line with those of in-state growers. The Supreme Court held the statute to be unconstitutional, both because of its discriminatory impact on the cost of doing business in North Carolina and because "the statute has the effect of stripping away from the Washington apple industry the competitive and economic advantages it has earned for itself through its expensive inspection and grading system."

No comparable effect is evident in the case at bar. It is true that the operators of Indiana solid waste facilities would have to incur the costs of collecting and remitting the $5.30 per ton surcharge if they wanted to receive waste from Van Wert County, but the operators of Ohio facilities would have to incur precisely the same costs in order to qualify to receive Van Wert County waste. Maharg's investment in the trucks

facility designee, whether or not the designee is located in Van Wert County.

Under these circumstances, we believe, the county's scheme cannot reasonably be said to discriminate on its face against interstate commerce. Although "a state may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State," *Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334, 342 (1992) (quoting *Armco, Inc. v. Hardesty*, 467 U.S. 638, 642 (1984)), that is not what Van Wert County is purporting to do. On the face of things, at least, Van Wert County is not engaging in the "simple economic protectionism" condemned by the Supreme Court in *Philadelphia*.

b

Maharg goes on to suggest in its opening appellate brief that facial discrimination aside, the restrictions imposed by Van Wert County "may" have had an impermissible discriminatory purpose. In this connection Maharg speculates that the county commissioners might have been motivated by a desire "to assist local haulers to the detriment of the larger haulers such as Maharg."

But Maharg's complaint provides no reason whatever to suppose that the commissioners were acting out of a desire to favor haulers that customarily used one of the seven approved Ohio facilities, only two of which are in Van Wert County. The discriminatory purpose argument looks to us like a red herring.[4]

---

[4] In its reply brief Maharg argues for the first time that Van Wert County was "commandeering the market" in order to compensate for a disappointing revenue flow at the county-owned Van Wert Transfer Station. But if the county had in fact been acting improperly in this regard, we assume that Maharg would have told us so in its opening brief. We note further that if Van Wert County had simply imposed a $5.30 per ton tax on the collection of waste within the county, Maharg concedes that it would have had no basis for challenging the tax under the United States

c

Even if the restrictions imposed by Van Wert County do not have an impermissible discriminatory purpose and do not discriminate on their face against interstate commerce, Maharg contends that the restrictions violate the Commerce Clause because they discriminate against interstate commerce in practical effect. See *Eastern Ky. Resources v. Fiscal Court of Magoffin Co., KY,* 127 F.3d 532, 540 (1997) (citing *Wyoming v. Ohio*, 502 U.S. 437, 454-55 (1992)): "A statute can discriminate against out-of-state interests in three different ways:  (a) facially, (b) purposefully, or (c) in practical effect."

i

Maharg's "practical effect" argument has two branches. The first is based on the concept – evocative of Kant's categorical imperative –  that a state may not adopt legislation the replication of which in other states would have the effect of strangling interstate commerce.[5]  See *Healy v. The Beer Institute, Inc.*, 491 U.S. 324, 336 (1989), where the Supreme Court observed that "the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States *and what effect would arise if not one, but many or every, State adopted similar legislation.*" (Emphasis supplied.)

Also pertinent in this connection is *C&A Carbone*.  In that case the Supreme Court struck down a local "flow control

ordinance" that required that all nonhazardous solid waste originating within the Town of Clarkstown, New York, be deposited at a transfer station which the town had arranged to have built within its borders under a contract that would ultimately allow the town to purchase the facility for a token sum.  The separate opinion of Justice O'Connor, concurring in the conclusion that Clarkstown's flow control ordinance was unconstitutional, returned to the theme sounded in *Healy*:

> "Over 20 states have enacted statutes authorizing local governments to adopt flow control laws.  If the localities in these States impose the type of restriction on the movement of waste that Clarkstown has adopted, the free movement of solid waste in the stream of commerce will be severely impaired.  Indeed, pervasive flow control would result in the type of balkanization the [Commerce] Clause is primarily intended to prevent." *C&A Carbone*, 511 U.S. at 406 (O'Connor, J., concurring) (footnote and citations omitted).

If Van Wert County had required that all locally generated waste be taken to a favored in-county facility, refusing to let facilities located elsewhere qualify as approved disposal sites, it is clear that the concerns expressed by Justice O'Connor would have been implicated here.  But the county has simply not resorted to the sort of "flow control" that Justice O'Connor was talking about.  The Van Wert County scheme does not automatically prevent locally generated waste from being taken to facilities outside the county (the reader will recall that there are only two in-county solid waste facilities among the eight facilities that sought and obtained Van Wert County's designation as approved sites), and the county appears to be correct in arguing, as it does, that its "fair, open and non-exclusive RFP process assured that any out-of-state facility that wanted access to the District's waste would get it."

If every county in both Indiana and Ohio were to adopt a regulatory scheme identical to Van Wert County's, we have

---

Constitution.

[5]Logically, perhaps, this concept has more to do with the "excessive burden" line of analysis than with the "discrimination" line of analysis. In the interest of consistency, however, we shall follow Maharg's taxonomy.