**GRAY'S DISPOSAL CO., INC., et al.**

v.

**METROPOLITAN GOVERNMENT OF NASHVILLE, Davidson County, Tennessee.**

Court of Appeals of Tennessee, Western Section, at Nashville.

Nov. 5, 2002 Session.

Dec. 31, 2002.

Permission to Appeal Denied by Supreme Court July 7, 2003.

Thomas E. Stewart; Thurman T. McLean, Jr., Gallatin, For Appellants Gray's Disposal Co., Inc., and Ray Webster, d/b/a Hermitage Hills Sanitary Co.

John L. Kennedy; Jennifer Surber, Nashville, For Appellee, The Metropolitan Government of Nashville and Davidson County.

## OPINION

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Garbage haulers filed suit against metro government challenging legality of "tipping fees" imposed by government on disposal of residential solid waste collected outside the city district and disposed of at government-owned waste facility. This suit was consolidated with government action against appellant-haulers for collection of unpaid tipping fees. Court granted government's Motion for Summary Judgment as to the action filed by appellant-haulers, finding that the tipping fee was not a tax, a rational basis existed for the fee, the fee did not constitute an unlawful flow control mechanism, and the fee was authorized by T.C.A. § 68–211–835(b), thereby immunizing the government from antitrust liability. The trial court further granted government's Motion for Summary Judgment filed in government's suit against haulers, finding that no genuine issue of material fact existed as to the amount owed by appellants in unpaid tipping fees. On appeal, haulers challenged fees on double taxation, equal protection, and federal interstate commerce clause grounds, asserting that the tipping fee was an illegal flow control device, unenforceable "double tax," and violation of haulers' equal protection rights under 42 U.S.C. § 1983, as it was discriminately applied to haulers disposing of waste from outside the city district, and not those disposing of waste collected within the city district. Haulers further appealed trial court's grant of summary judgment in the consolidated case on the basis that haulers could not be held liable for payment of fees imposed under an unconstitutional flow control regulation. We affirm the trial court's grant of summary judgment as to the action filed by appellant-haulers, and vacate the summary judgment Order entered in favor of the government in the action initiated by appellees.

This case involves a dispute over the legality of tipping fees assessed by the Metropolitan Government of Nashville, Davidson County, Tennessee ("Metro"), against individual garbage haulers who collected solid waste from private residents in the General Service District of Nashville, and disposed of the refuse at a government-owned waste facility.

Pursuant to Section 1.03 of the Charter of the Metropolitan Government, read in conjunction with T.C.A. §§ 7–1–105 and 7–2–108(5)(A), Davidson County, Tennessee is divided into two service districts, a General Services District ("GSD") and an Urban Services District ("USD"). Metro maintains jurisdiction and authority over both districts. The GSD consists of the total area of Davidson County, Tennessee.

The USD encompasses the principal city of Nashville and subsequent annexed areas. USD residents "generally receive more services and pay a higher property tax rate."[1]

Under Section 1.05 of the Metropolitan Charter, Metro provides solid waste disposal services to all residents in the GSD and USD. Metro only provides solid waste collection services to residents within the USD. In the USD, the Metropolitan Government collects all residential solid waste through a combination of Public Works' employees and equipment and private haulers under contract by competitive bidding.

Appellant Gray's Disposal Co., Inc. ("Gray's"), is a Tennessee corporation engaged in the "business of collecting garbage as a[sic] agent for the disposal of garbage for owners and residents located and situated in the General Services District." Gray's disposed of GSD collected refuse at the Metropolitan Thermal Transfer Corp. ("Thermal"), a solid waste disposal facility owned by Metro. Gray's did not haul garbage for Nashville, Davidson County residents living within the USD. In November of 1995, Gray's filed for reorganization under Chapter 11 of the United States Bankruptcy Code. Gray's continues to operate as a private garbage hauler for GSD residents.

Appellant Ray Webster, d/b/a/ Hermitage Hills Sanitary Co. ("Webster"), is a sole proprietorship organized for the purposes of providing garbage disposal services exclusively to homeowners and residents located in the GSD. Webster disposed of the waste collected from GSD clients at the Thermal facility. Webster did not supply garbage disposal services to homeowners and residents located within the USD. Webster sold Hermitage Hills Sanitary Co. in 1997 for approximately $800,000.00.

In 1975, Metro passed an ordinance imposing a per ton fee on solid waste deliveries to the Thermal facility. This fee is presently labeled a "tipping fee." Tipping fees are only assessed to deliveries of solid waste collected by haulers outside of the USD.[2] According to appellee's brief:

1. The additional services provided to USD residents by the metropolitan government are set forth in Section 1.05 of the Metropolitan Charter. Section 1.05 further details and distinguishes the services provided to residents within the GSD. Section 1.05 reads:

The functions of the metropolitan government to be performed, and the governmental services to be rendered throughout the entire general services district shall include: general administration, police; courts, jails; assessment; health; welfare; hospitals; housing for the aged; streets and roads; traffic; schools; parks and recreation; library; auditorium, fairgrounds; airport; public housing; urban redevelopment; urban renewal; planning;· electrical code; building code; plumbing code; housing code; electricity; transit; *refuse disposal;* beer supervision; and taxicab regulation. The *additional* functions of the metropolitan government to be performed and the additional government services to be rendered within the urban services district shall include: additional police protection; fire protection; water; sanitary sewers; storm sewers; street lighting; street cleaning; *refuse collections* and wine and whiskey supervision.
(emphasis added).

2. In an affidavit filed December 12, 2000, Billy Davis ("Davis"), Assistant Director of Public Works, testified as to the current value of the tipping fee, and the process for assessing this fee.

The tipping fees have been raised and lowered over the years. The current tipping fee for disposal at Nashville Thermal is $24.00 per ton. That fee was reduced from $44.00 per square yard in June, 1998 by ordinance.

\* \* \* \* \* \*

The process for assessing the tipping fee is as follows: (a) Vehicles hauling solid waste to Nashville Thermal are weighed on a

The Department of Public Works does not charge itself a tipping fee for delivery of solid waste to Nashville Thermal because there would be no net gain to the Solid Waste Fund through such a budget transfer and the Department would incur more administrative costs. Likewise, the Metropolitan Government does not charge a tipping fee to the private haulers of solid waste on solid waste collected in the USD through their contracts[3] with the Metropolitan Government.

Tipping fees are not paid in cash upon delivery, but are billed to the private haulers on a monthly basis. The amount charged in each bill is based on the weight of the solid waste delivered to Thermal by the individual hauler. Revenues from the tipping fees are deposited in the Metropolitan Government's Solid Waste Disposal Fund. All costs associated with the collection and disposal of solid waste are paid directly from this fund.

As stated, Gray's and Webster both utilized the Thermal facility for disposal of solid waste collected from GSD residents. Around 1983, pursuant to the 1975 ordinance, Metro began assessing tipping fees on every delivery of GSD collected waste disposed of at the Thermal facility, including disposals made by appellants.[4]

According to the filed Affidavit of Gene Nolan ("Nolan"), Associate Director of Finance for Metro, the stated purpose for these fees is to supplement and balance the program budget for the Public Works Solid Waste Disposal Fund. Nolan further testified that "[t]ax revenues, alone, are not sufficient to pay for the cost of garbage disposal in Davidson County."

On November 6, 1998, appellants filed a complaint against Metro and Thermal asserting multiple causes of action. Specifically, appellants alleged that the tipping fees charged constituted unlawful flow control devices, violated appellants' rights under the Tennessee Human Rights Law and Tennessee Civil Rights Statutes, were "contrary to Section 1.05 of the Charter of the Metropolitan Government of Nashville, Davidson County, Tennessee, violated the Interstate Commerce Clause of the United States Constitution and 42 U.S.C. § 1983 of the Federal Civil Rights Act, and caused appellants to suffer damages by "creating unfair competition, destruction of competition, and restraint of trade."[5] Shortly thereafter, Metro filed a verified complaint against Webster for payment of $55,275.00 in unpaid tipping fees.

Metro filed an Answer to Complaint on January 4, 1999.[6] In its Answer, Metro admitted to imposing a tipping fee

---

scale owned and operated by Public Works; (b) The driver presents a permit card at the scale house. The card identifies the owner of the vehicle; (c) The tipping fee is calculated based upon the weight of the solid waste in the vehicle; and (d) The owner of the truck is billed monthly for the tipping fee.

3. Under the terms of their contracts with Metro, private haulers receive credit for residential solid waste collected in the USD and disposed of at Thermal. Davis testified in his affidavit that the credit is currently predicated on an annual national average of 43 pounds of solid waste per week, per household.

These contracts are "let" through public bids, and are subject to re-bid upon expiration.

4. Webster ceased disposing of solid waste at Thermal in December of 1997, upon the sale of Hermitage Hills Sanitary Co.

5. Appellants also sought judgments from the court declaring the tipping fees illegal, and affirming that the appellants were entitled to a refund of "all past tipping fees paid by Plaintiffs to the Defendants and an accounting for the same."

6. Thermal filed its own Answer on February 25, 1999.

on deliveries of solid waste collected by appellants and disposed of at Thermal, but denied that such fees were illegal or unconstitutional. Metro further asserted that appellants lacked standing to sue on behalf of the GSD residents, and that Metro was "immune from liability for restraint of trade because the tipping fees are specifically authorized pursuant to state policy under T.C.A. § 7–54–103."

In January of 1999, Webster filed a Sworn Answer to Metro's complaint, denying that he owed any money to Metro. Webster averred that he was "required to dispose all of his waste at the Thermal Transfer Plant, contrary to the law, and pay a tipping fee at the Thermal Transfer Plant, contrary to the law." In an Agreed Order filed January 25, 1999, Chancellor Carol L. McCoy granted Webster's Motion to Transfer Metro's Complaint for unpaid tipping fees (hereinafter referred to as case number 98–3400–II(III)), to Part III of the Davidson County Chancery Court for purposes of consolidating the matter with appellants' action against Metro challenging the legality of the tipping fees, case number 98–3317–III.

On December 7, 2000, appellants filed a Motion for Non Suit as to Thermal. Appellants' motion was granted; therefore, Metro is hereinafter the sole appellee for purposes of appellants' action of November 6, 1998.

Metro filed a Motion for Summary Judgment in case number 98–3317–III on December 18, 2000. As grounds for this motion, Metro stated that the undisputed material facts and applicable law in this case require the following conclusions.

1. That the tipping fee for solid waste disposal is not double taxation;

2. Plaintiff's lack standing to pursue certain claims;

3. Imposition of the tipping fee does not violate any constitutional right of Plaintiff's;

4. The tipping fee is not an impermissible device to control the flow of solid waste;

5. T.C.A. § 4–21–101 et seq and 39–17–108 do not apply to this lawsuit; and

6. The tipping fee does not violate the Sherman Act.

In support of this motion, Metro filed a Statement of Undisputed Material Facts and the affidavits of Gene Nolan and Billy Davis. On February 1, 2001, appellants filed a Response in Opposition to Defendant's Motion for Summary Judgment. Additionally, appellants filed their own Motion for Summary Judgment in case number 98–3317–III.[7] As part of the response, appellants abandoned the Tennessee Human Rights and Tennessee Civil Rights claims asserted in their original complaint.

Metro's Motion for Summary Judgment was heard by the chancery court on February 16, 2001. In an Order entered March 12, 2001, the court granted Metro's motion as to the issues of double taxation, equal protection, violation of the Commerce Clause of the United States Constitution, and restraint of trade. We quote from the court's Order:

1. *Double Taxation* The Court finds, relying upon undisputed facts numbers 10 and 11,[8] that the tipping fee is not a

---

**7.** In an Order entered February 13, 2001, Chancellor Ellen Hobbs Lyle determined that the summary judgment motions filed by the parties in case number 98–3317–III would not be consolidated. The chancellor thereby proceeded to set separate hearing dates for the individual motions.

**8.** Undisputed fact 10 from Metro's statement of facts reads: "All tipping fees received by Public Works are placed in the Solid Waste

tax, but is a fee. The Court further finds that no issue of double taxation exists, and that Plaintiff's claim of double taxation should be dismissed on summary judgment.

2. *Equal Protection* The Court finds that there is a clear rational basis for the Metropolitan Government not charging itself a tipping fee, in that it conserves public funds; and thus, Plaintiffs' claim of violation of equal protection should be dismissed on summary judgment. The Court makes no determination whether any classification of haulers exists.

3. *Flow Control* The Court finds that the tipping fee is not coercive, and therefore, is not a flow control mechanism. The Court further finds that Plaintiffs' claim that the tipping fee is a means of controlling the flow of solid waste does not impact the Commerce Clause of the United States Constitution, and should be dismissed on summary judgment.

4. *Restraint of Trade* The Court finds that the Parker Immunity Doctrine applies in this case, using *Columbia v. Omni Outdoor Advertising,* 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d, 382 (1991), as guidance. The Court further finds that the Metropolitan Government is acting under T.C.A. §§ 68–11–835 and 7–54–101 *et seq.,* in imposing a tipping fee, and as such, is immune from antitrust liability. The Court, therefore, determines that Plaintiffs' claim of restraint of trade should be dismissed on summary judgment.

The court's grant of summary judgment in favor of Metro rendered appellants' motion moot. The court explicitly noted that this Order did not affect the consolidated case, case number 98–3400–II(III).

On September 21, 2001, Metro filed a Motion for Leave of Court to File Amended Complaint, for the purpose of adding Gray's as a defendant in the consolidated cases-specifically case number 98–3400–II(III). Explaining its failure to include Gray's as a defendant in its original complaint, Metro noted that Gray's was in bankruptcy at the time of filing. Metro further explained in its Verified Amended Complaint.

> Gray's Disposal Co., Inc. filed for Chapter 11 bankruptcy on November 30, 1995. On May 7, 1996, the Metropolitan Government filed a proof of claim with the U.S. Bankruptcy Court for the Middle District of Tennessee for unpaid tipping fees in the amount of $96,061.00.[9] ... This claim was not objected to by Gray's Disposal Co., Inc.
>
> Gray's Disposal Co., Inc.'s bankruptcy plan was confirmed by Order of U.S. Bankruptcy Court on February 12, 1997, and its bankruptcy case was closed on September 5, 2000.

In addition to the $96,061.00 debt incurred by Gray's prior to its bankruptcy filing, Metro asserted that Gray's owed $66,979.80 in unpaid tipping fees assessed on deliveries made after confirmation of Gray's Chapter 11 bankruptcy plan.

Gray's opposed Metro's motion to file an amended complaint, stating that the Chapter 11 plan confirmed by the United States Bankruptcy Court established a payment

Disposal Fund." Fact 11 provides that "[t]ax revenues alone do not cover the cost of disposal of solid waste."

9. A Proof of Claim from the United States Bankruptcy Court, Middle District of Tennessee, was submitted as an exhibit to Metro's

Verified Complaint. According to this exhibit, the total amount of Metro's claim against Gray's is listed as $96,061.00. We assume that the discrepancy in amounts is simply the product of a typographical error.

schedule that listed creditors in a specific order. Pursuant to this plan, "the debt to Metro Government in the amount of $96,061.00 is not yet scheduled for payments to begin, and, consequently, is not yet ripe for Metro to attempt collections."

On October 24, 2001, Metro filed a Motion for Summary Judgment specifically addressing the claims set forth in case number 98–3400–II(III). As grounds for this motion, Metro asserted that the "material undisputed facts and the statutes applicable to this case conclusively show that Hermitage Hills Sanitary Company and/or Ray Webster owes $55,275.00 to the Metropolitan Government for unpaid tipping fees and that Gray's Disposal Company, Inc. owes $66,979.80 for unpaid tipping fees, as well." Metro did not seek summary judgment with regard to the $96,061.00 debt allegedly owed by Gray's for unpaid tipping fees incurred prior to February 12, 1997.

Appellants filed a response opposing Metro's summary judgment motion. As the basis for this response, appellants asserted that they were not liable for tipping fees imposed by Metro as a mandatory element of a flow control regulation that was eventually deemed unconstitutional by the Sixth Circuit in *Waste Mgmt. v. Metropolitan Gov't*, 130 F.3d 731 (6th Cir.1997). Appellants' maintained that tipping fees are an unconstitutional tax, not subject to collection. We further interpret appellants' response as a statement inherently opposing the collection of tipping fees imposed by Metro upon appellants prior to the Sixth Circuit's decision in *Waste Mgmt.*

The court ruled on Metro's Motion for Leave to Amend the Complaint by order of October 31, 2001, granting Metro's motion in part and denying in part. The court allowed Gray's to amend its complaint to include an action for the $66,979.80 in un-

paid tipping fees incurred after the confirmation of Gray's Chapter 11 bankruptcy plan. With respect to Metro's claim for $96,061.00 in unpaid fees incurred by Gray's prior to February 12, 1997, the court found that it lacked jurisdiction to enforce the Order of the U.S. Bankruptcy Court confirming Gray's bankruptcy plan.

Metro's Motion for Summary Judgment came to be heard on October 19, 2001. In an Order entered October 31, 2001, the court granted Metro's motion with respect to case number 98–3400–II(III), finding that "no genuine issue of material fact exists as to the $66,979.80 in unpaid tipping fees incurred by Gray's Disposal Co., Inc. and as to the $55,275.00 in unpaid tipping fees incurred by Hermitage Hills Sanitary Company, and that Defendants owe said amounts to the Metropolitan Government." This Order was final as to case number 98–3317–III and case number 98–3400–II(III). Appellants filed timely notices of appeal in both matters.

On appeal, appellants present the following issues for review: (1) Whether the trial court erred in ruling that the tipping fee imposed by Metro on solid waste collected from the GSD and disposed of at Thermal does not constitute double taxation; (2) Whether the trial court erred in concluding that the tipping fee imposed by Metro does not violate appellants' equal protection rights under 42 U.S.C. § 1983; (3) Whether the trial court erred in concluding that the tipping fee was not a flow control mechanism and therefore did not "impact" the Interstate Commerce Clause of the United States Constitution; and (4) Whether the trial court erred in ruling that Metro did not engage in the unlawful restraint of trade through the imposition of the tipping fee, as Metro was acting under the authority of T.C.A. §§ 68–211–835 and 7–54–101 and therefore immune from antitrust liability. As to case number

98–3400–II(III), the sole issue for appeal is whether appellants are liable for payment of unpaid tipping fees including those incurred under an illegal flow control regulation; specifically, tipping fees imposed prior to the Sixth Circuit's decision in *Waste Mgmt.* on November 5, 1997.

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.03. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Bain v. Wells,* 936 S.W.2d 618, 622 (Tenn.1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Id.* In *Byrd v. Hall,* 847 S.W.2d 208 (Tenn.1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id.* at 210–11 (citations omitted) (emphasis in original).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *Carvell v. Bottoms,* 900 S.W.2d 23, 26 (Tenn.1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment.

*Bain,* 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *Warren v. Estate of Kirk,* 954 S.W.2d 722, 723 (Tenn.1997).

Here, the facts are not in dispute, and the only issues are questions of law. We therefore review the trial court's grant of summary judgment *de novo,* with no presumption of correctness.

## I.

The first issue presented for review is whether the trial court erred in concluding that the tipping fee imposed by Metro on solid waste collected within the GSD and disposed of at Thermal did not amount to double taxation. The trial court granted Metro's summary judgment motion as to the issue of double taxation on the basis that the tipping fee was a fee, not a tax. In reaching this decision, the court explicitly relied upon two facts set forth in Metro's Statement of Undisputed Material Facts, filed in support of the above motion. The court was notably persuaded by evidence that all of the proceeds generated from the tipping fees were placed in the Solid Waste Disposal Fund, and the fact that tax revenue alone could not cover the cost of solid waste disposal.

In their response opposing Metro's Motion for Summary Judgment, appellants submit that they "have no objection" to the statute authorizing Metro to impose tipping fees to defray the cost of solid waste. Appellants primary challenge, as stated in their original petition, is that the tipping fee assessed against appellants for the disposal of residential solid waste collected within the GSD constituted an impermissible double taxation on a single privilege. Appellants argument is premised on the conclusion that GSD residents "had already paid for their garbage disposal through their property taxes." As part of

their argument challenging the trial court's decision, appellants assert that the court erroneously classified the tipping fees as fees, rather than taxes.

■ The court notes initial concern with regard to whether appellants, as private business entities attempting to challenge a municipal "tax" on behalf of citizens of the GSD, satisfy the legal requisites for third party standing under the facts and circumstances of this case.

In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties. *Dep't of Labor v. Triplett,* 494 U.S. 715, 720, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990); *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). This fundamental restriction on our authority admits of certain, limited exceptions. We have recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: The litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute *id.* at 112 [96 S.Ct. 2868]; the litigant must have a close relation to the third party *id.* at 113–114 [96 S.Ct. 2868]; and there must exist some hindrance to the third party's ability to protect his or her own interests. *Id.* at 115–116 [96 S.Ct. 2868]. *See also Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

*Powers v. Ohio,* 499 U.S. 400, 410–11, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411, 425 (1991).

■ Applying the three-prong analysis set forth above, we find that appellants fail under the first prong. Appellants assert that they have suffered direct financial loss or hardship as a result of the tipping fees because they are required to pass these fees on to customers, thereby prompting the customers to seek cheaper disposal measures. While we recognize that appellants have experienced a degree of financial loss as a result of the imposition of these fees, we find that the customer-residents, not the haulers, bear the ultimate brunt of shouldering these costs. Thus the residents, individually or as a class, are better suited to bring an action challenging Metro's imposition of tipping fees upon the disposal of GSD residential waste.

■ Regardless of the standing concern, we find that the tipping fees imposed by Metro do not constitute impermissible double taxation. Because the parties agree that T.C.A. § 5–19–109 and T.C.A. § 68–211–835 regulate and authorize the imposition, collection, and use of tipping fees by individual counties with regard to the control and disposition of solid waste,[10] we need only address the issue of whether the tipping fees are an unlawful, excessive tax, or a permissible statutory fee.

The Tennessee Supreme Court has explicitly defined the applicable test for determining whether a charge imposed by the county government is a tax or a fee, as follows:

Whether the charge for depositing waste in a landfill is a tax or a fee, even though denominated a tax, is determined by its

---

**10.** Pursuant to the provisions of T.C.A. § 68–211–835, only local governments and solid waste authorities are permitted to impose county fees, provided that specific statutory conditions are met. Section 68–211–835(a) provides:

Each county, municipality, or solid waste authority which owns a municipal solid waste disposal facility or incinerator may impose a tipping fee upon each ton of municipal solid waste or its volume equivalent received at such solid waste disposal facility or incinerator.

purpose. A tax is a revenue raising measure levied for the purpose of paying the government's general debts and liabilities. (internal citations omitted). A fee is imposed for the purpose of regulating a specific activity or defraying the cost of providing a service or benefit to the party paying the fee.

*City of Tullahoma v. Bedford County,* 938 S.W.2d 408, 412 (Tenn.1997) (citations omitted).

■ Applying the test above to the facts in this case, we find that the court correctly determined that the tipping fees imposed by Metro are, in fact, fees rather than taxes. As stated, the dispositive factor in determining whether a charge is a tax or a fee is the purpose for which the charge is imposed. Consideration of whether payment of the tax is voluntary or involuntary is irrelevant. T.C.A. § 68–211–835(b) states that "[r]evenue from tipping fees at publicly owned solid waste disposal facilities and incinerators received by counties, municipalities and solid waste authorities shall be expended only for solid waste management purposes." Metro submitted the affidavits of Billy Davis and Gene Nolan as evidence of Metro's compliance with T.C.A. § 68–211–835(b). Both affiants testified that all of the tipping fees received by Public Works were placed in the Solid Waste Disposal Fund to cover the cost of solid waste disposal in Davidson County. Davis and Nolan further stated that these fees were necessary as tax revenues in Davidson County alone are insufficient to finance the cost of garbage disposal. Appellants do not dispute the fact that the fees were correctly deposited in and applied from the Solid Waste Disposal Fund, and even stated in their response opposing Metro's Motion for Summary Judgment that they agreed that the taxes and fees were used and applied according to the statute.

Therefore, there is sufficient, undisputed evidence in the record that all of the revenue generated from tipping fees was deposited in the Solid Waste Disposal Fund and used exclusively to defray the cost of waste disposal services in USD per the mandates of T.C.A. § 68–211–835(b). On this basis, we find that the trial court correctly determined that the tipping fee is a fee and not a tax. This issue is therefore without merit.

## II.

■ The next issue presented by appellants is whether the trial court erred in concluding that the tipping fees do not violate appellants' equal protection rights under 42 U.S.C. § 1983. The basis for appellants' § 1983 equal protection argument is sufficiently set forth in the following passage from appellants' response opposing Metro's summary judgment motion in case number 98–3317–III:

In the case at bar Metro provides both refuse collection and disposal. The dispute is over refuse disposal with Metro not charging the same amount and giving equal protection to the residents and contract providers. To be more specific, Metro, in its Urban Service District function of refuse collection, collects residents' garbage in USD either through its own Public Works trucks or through private contract haulers. Metro does not require these residents or the haulers to pay a dumping or tipping fee in that, if they did, the haulers would add that on to their contract price....

On the other hand, Metro does not give credit to the residents in GSD that live outside USD, although they pay the same tax for the same function of refuse disposal as residents and taxpayers in GSD that live within the boundaries of the Urban Service District or USD. Therefore, the garbage collectors in

GSD outside USD have to put in their contracts with their customers not only the cost of collection, but enough to pay the estimated $6.00 to $8.00 per residence dumping fee.

Metro's failure to impose tipping fees on USD waste collected and disposed of by Public Works employees or government-contracted haulers, forms the basis for appellants' § 1983 action.

At the core of appellants' equal protection issue is the question of whether USD residents do, in fact, pay higher or additional taxes for garbage disposal, above and beyond the taxes paid by GSD residents for the same service. If USD residents in fact pay a higher tax rate for the purpose of funding disposal services in the USD, then the question of whether the tipping fees violate appellants' equal protection rights is a moot. Under such circumstances, the tipping fees would be justified as a balancing cost as these fees would ensure that GSD residents paid the same or similar price as USD residents for the privilege of disposal services. The fact that residential waste generated within the USD is not assessed a tipping fee would not raise equal protection concerns as the USD residents would have already paid additional taxes toward the funding of these services, not required of GSD residents.

Metro submitted Gene Nolan's affidavit, as evidence that USD residents were required to pay a higher tax than GSD residents for additional governmental services. Nolan stated:

Residents of the Urban Services District pay a higher tax than do the residents of the General Services District, because by Charter, additional governmental services are performed in the Urban Services District.

As a result of the higher tax rate in the Urban Services District, Urban Services District residents pay for garbage disposal through taxes. Therefore, tipping fees are rebated to garbage haulers based on the number of Urban Services District residences on their route.

Appellants entered as exhibits to Nolan's affidavit, a page from Metro's budget report regarding the budget for solid waste in the fiscal year 2001, and a "flow chart showing the breakdown of the use of tax revenue and tipping fee revenue for disposal of solid waste." While there is undisputed evidence in the record that USD residents were charged a higher tax rate for additional governmental services,[11] there is no evidence to indicate the exact percentage or amount USD residents were charged for garbage disposal. Nor is there evidence in the record detailing the precise difference between USD and GSD tax rates. Therefore, we are unable to determine the issue of equal protection on the basis of whether USD residents did, in fact, pay additional taxes not required of GSD residents, for solid waste disposal, as such taxes may or may not have been equivalent to the tipping fees assessed against GSD residential waste. We thus proceed with our equal protection analysis.

Pursuant to 42 U.S.C. § 1983 (Supp.2002):

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory, or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities se-

---

11. At oral argument, counsel for appellants conceded that USD residents may have been charged a higher tax rate, but suggested that the additional amount charged per resident was minimal.

cured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

A civil remedy is available pursuant to 42 U.S.C. § 1983 where a party is deprived of a federally protected right by a person(s) acting under the color of state law. To maintain an action under this statute, the party challenging the statute must prove: (1) that the conduct of the defendant deprived the plaintiff of rights, privileges or immunities ensured by the Constitution or laws of the United States; (2) that the offending conduct was committed by a person acting under the color of state law. *See West v. Atkins,* 487 U.S. 42, 48–49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). In the case at bar, appellants' allege that Metro,[12] acting under the authority of T.C.A. § 68–211–835, deprived appellants of their right to be treated equally under the law through the imposition of tipping fees against one class (GSD garbage haulers) and not another (USD garbage haulers). We find appellants' issue without merit.

In order to analyze appellants' equal protection claim, we must first define the members of the class to which appellants belong. The facts of this case lend to two potential classifications. First, appellants' class could be defined to include only GSD haulers. Under this classification, GSD haulers would be a class of haulers entirely separate and distinct from USD haulers. In this instance, the equal protection rights of appellants as GSD haulers would only be compared and considered against the rights of other GSD haulers. Because all GSD haulers are assessed tipping fees on disposal of GSD waste, appellants' equal protection argument would fail under this classification.

The second possible classification would include all garbage haulers licensed in Davidson County—GSD haulers and USD haulers alike. It is under this classification that appellants argument challenging the "unequal" treatment of GSD haulers and USD would require an equal protection analysis. Analyzing this case from the perspective that appellants are members of a class that includes all licensed garbage haulers in Davidson County, regardless of client base, we find that appellants' equal protection claim fails for the following reasons.

Appellants cite to no case law in support of their argument that the imposition of a tipping fee by a municipality against one faction of a single class (GSD haulers) and not another (USD haulers), is a violation of the charged class's equal protection rights under the United States Constitution. The only case law cited to by appellants stands for the rule that "local taxes must merely be equal and uniform in the district to which they apply." *Nashville, C & S.L. Ry. v. Marshall County,* 161 Tenn. 236, 30 S.W.2d 268, 271 (1930) (citations omitted). As has been established, the tipping fee imposed by Metro is a fee, not a tax. Therefore, the case law relied upon by appellants is unpersuasive. We find no other case law providing that the imposition of non-uniform fees against members of the same class necessarily constitutes an equal protection violation. Although not necessarily controlling in the case at bar, we cite to language from an earlier decision of this Court as support for our con-

---

**12.** A municipality is a proper party in actions brought under § 1983. *See United Steelwork-* *ers of America, AFL–CIO–CLC v. Dalton,* 544 F.Supp. 282, 290 (E.D.Va.1982).

clusion that the imposition of non-uniform fees within a single class does not automatically raise equal protection concerns. "That one group is required to pay more than another group for the same privilege is not in and of itself a violation of the Equal Protection Clause." *S & P Enterprises, Inc. v. City of Memphis,* 672 S.W.2d 213, 216 (Tenn.Ct.App.1983) (citing *Baldwin v. Fish & Game Comm'n of Montana,* 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978)).

Because appellants' equal protection argument hinges solely on the theory that imposition of non-uniform fees within a single class of individuals is an equal protection violation, we find that, under the circumstances, the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion-that Metro did not violate appellants' equal protection rights through the assessment of tipping fees. Therefore, we find that the trial court correctly granted summary judgment in favor of Metro on appellants' 42 U.S.C. § 1983 claim.

▮▮▮ In the event that appellants could be considered to have a constitutionally protected right to be free from the imposition of non-uniform tipping fees, we maintain that the trial court's grant of summary judgment was proper as a clear and rational basis existed to justify these fees. There is no evidence in the record,

and appellants have cited to no legal authority in support of such a finding, that the appellants were members of a "suspect class."[13] Nor is there evidence or controlling authority to suggest that the right to be free from a non-uniform tipping fee is a fundamental right along the lines of the rights to procreate, vote, or engage in interstate travel. Therefore, we find that appellants' equal protection claim must be examined under a rational basis analysis.[14]

Rational basis analysis has been discussed at length by the Tennessee Supreme Court, and the application of this analysis has been explained as follows:

The concept of equal protection espoused by the federal and our state constitutions guarantees that 'all persons similarly circumstanced shall be treated alike.' *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920); *see Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *State ex rel. Dep't of Social Servs. v. Wright,* 736 S.W.2d 84 (Tenn.1987). Conversely, things which are different in fact or opinion are not required by either constitution to be treated the same. *Plyler,* 457 U.S. at 216, 102 S.Ct. at 2394. 'The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States,' and legislatures are given considerable latitude in

---

**13.** Courts have traditionally defined "suspect" classes along the lines of race, age, national origin, and alienage.

**14.** [A] legislative classification is subject to strict scrutiny when it interferes with a fundamental right or operates to the disadvantages of a suspect class of persons. *See Evans v. Steelman,* 970 S.W.2d 431, 435 (Tenn.1998) (citing *Newton v. Cox,* 878 S.W.2d 105, 109 (Tenn.1994)). If, however, a legislative classification does not interfere with a fundamental right or adversely affect a suspect class of persons, then the classifi-

cation is subject to rationale basis scrutiny. *See Evans,* 970 S.W.2d at 435 (citing *Newton,* 878 S.W.2d at 110). Under rational basis scrutiny, a legislative classification will be upheld if a reasonable basis can be found for the classification or if any set of facts may reasonably be conceived to justify it. *See Tennessee Small Sch. Sys. v. McWherter,* 851 S.W.2d 139, 153 (Tenn. 1993) (citing *Harrison v. Schrader,* 569 S.W.2d 822, 825–26 (Tenn.1978)). *Caudill v. Foley,* 21 S.W.3d 203, 211 (Tenn.Ct. App.1999).

determining what groups are different and what groups are the same. *Id.* In most instances the judicial inquiry into the legislative choice is limited to whether the classifications have a reasonable relationship to a legitimate state interest. *Id.; see State v. Southern Fitness and Health, Inc.,* 743 S.W.2d 160, 164 (Tenn.1987); *Harrison v. Schrader,* 569 S.W.2d 822, 825 (Tenn.1978). *Tennessee Small School Sys. v. McWherter,* 851 S.W.2d 139, 153 (Tenn.1993) (quoting *Doe v. Norris,* 751 S.W.2d 834, 841 (Tenn.1988)).

Under the rational basis standard, "if some reasonable basis can be found for the classification, or if any state of facts may reasonably be conceived to justify it, the classification will be upheld." *McWherter,* 851 S.W.2d at 153. The Tennessee Supreme Court, in *Harrison v. Schrader,* 569 S.W.2d 822 (Tenn.1978) further examined the parameters and application of the rational basis test:

The classification must rest upon a reasonable basis. If it has a reasonable basis, it is not unconstitutional merely because it results in some inequality. Reasonableness depends upon the facts of the case and no general rule can be formulated for its determination. (internal citations omitted).

The burden of showing that a classification is unreasonable and arbitrary is placed upon the individual challenging the statute; and if any state of facts can be reasonably conceived to justify the classification or if the reasonableness of the class is fairly debatable, the statute must be upheld. (internal citations omitted).

Before the classification will be held to violate the equal protection guaranty, it must be shown that it has no reasonable or natural relation to the legislative objective. (internal citations omitted). In addition, the statute must apply alike to all who fall within, or can reasonably be brought within the classification. (citations omitted).

*Id.* at 825–26.

Metro contends that "[e]ven if the 'rebate' of the tipping fee to USD haulers amounts to different treatment," the imposition of non-uniform tipping fees is supported by a rational basis-the conservation of public funds. Metro relies upon the affidavits of Davis and Nolan as evidence that the imposition of tipping fees against Public Works or the government-contracted haulers would result in no net gain to the Solid Waste Disposal Fund.

The Metropolitan Government would only be charging a fee to itself and moving the same money out of and back into the Solid Waste Fund. There would be no gain but, invariably, the Metropolitan Government would incur expenses in employee time and accounting for absolutely no purpose. The same is true with respect to Metro's contractors who collect and haul residential solid waste within the USD. The compensation for these haulers is also taken from Metro's solid waste fund. Were the Metropolitan Government to charge these haulers a tipping fee, they would only raise their bids to the Metropolitan Government by the same amount in order to recover the cost of doing business. The increase in contract price would come from the Solid Waste Fund, and fee receipts would be put back into the fund. The situation is the same as in the case of solid waste delivered by Metropolitan Public Works. Thus, charging a tipping fee to those haulers results in no net gain to the Solid Waste Fund, but guarantees more expense in administration.

Based on the sworn statements of Davis and Nolan, cited in Metro's brief and entered as part of the record, we are per-

suaded that the state of the facts in this case may reasonably permit only one conclusion—that a rational basis exists to justify the differential treatment of GSD and USD haulers. We therefore uphold the trial court's grant of summary judgment on appellants' § 1983 action.

This issue is without merit.

### III.

■■■ The third issue for review is whether the trial court erred in concluding that the tipping fees were not a flow control mechanism and, as imposed, did not impact the Commerce Clause of the United States Constitution. The exact language of the court's ruling reads:

> The Court finds that the tipping fee is not coercive, and therefore, is not a flow control mechanism. The Court further finds that Plaintiffs' claim that the tipping fee is a means of controlling the flow of solid waste does not impact the Commerce Clause of the United States Constitution, and should be dismissed on summary judgment.

Appellants' challenge this ruling on the premise that the tipping fee charged by Metro is a flow control measure, imposed in violation of the Interstate Commerce Clause of the United States Constitution, as determined by the Sixth Circuit in *Waste Mgmt., Inc. of Tennessee v. Metro. Gov't of Nashville and Davidson County,* 130 F.3d 731 (6th Cir.1997).

In *Waste Mgmt.,* plaintiff Waste Management, Inc. of Tennessee ("WMIT")[15] sought injunctive relief from a flow control regulation and a waste disposal fee ordinance enacted by the Metropolitan Government of Nashville and Davidson County ("Metropolitan").[16] *Id.* at 733. The district court granted a permanent injunction of the provisions in the waste disposal fee ordinance that required Nashville Thermal Transfer Corp. ("NTTC") to assess a per ton tipping fee on all disposed solid waste, and further required all garbage collectors to pay a waste disposal fee to Metropolitan for waste dumped at sites other than NTTC. *Id.* at 735. This fee was required of "any collector operating a facility within Metro for waste collected within Metro, and by any collector collecting such waste and disposing of it outside of Metro." *Id.* at 734. The district court, however, refused to enjoin the flow control regulation. *Id.* at 735. Amendments to the flow control regulation required that:

> [A]ll persons collecting, hauling, or removing waste from Metro be licensed; that the waste be disposed of only at sites approved by Metro; and that all residential waste collected within Metro be disposed of at a waste-to-energy facility owned by Metro and operated by the Nashville Thermal Transfer Corp. ("NTTC").

*Id.* at 733.

In its opinion, the Sixth Circuit began with an examination of WMIT's claim that the district court erred in ruling that Metropolitan's flow control regulation did not violate the Commerce Clause. *Id.* at 736. The court determined that the flow control regulation did, in fact, discriminate against interstate commerce, as the provisions of this regulation required "that all residential waste be sent to NTTC, thereby preventing plaintiff from disposing of such

---

**15.** WMIT was licensed to collect and dispose of waste within the Metropolitan boundaries, and in addition operated its own waste disposal facility in Metropolitan. *Id.* at 734.

**16.** Pursuant to its amended complaint, WMIT sought declaratory and injunctive relief on the theory that the flow control regulation and waste disposal fee provisions violated the Commerce Clause of the United States Constitution. *Id.* at 735.

waste at a cheaper facility, and threatening the well-being of plaintiff's own dump sites." *Id.* (emphasis in original). Upon reaching this conclusion, the court then turned its focus to the decision of whether Metropolitan "demonstrated, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Id.* (quoting *C & A Carbone, Inc. v. Clarkstown,* 511 U.S. 383, 392, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994)). Finding Metropolitan's flow control regulation facially discriminatory, the court reasoned that regulation could not withstand rigorous scrutiny because there were other less restrictive means of advancing the legitimate local interests of the municipality, including the imposition of competitive tipping fees for waste disposal at the government-owned facility. *Id.*

With regard to the waste disposal fee provisions, the court agreed with the decision of the district court, finding that the provisions were facially discriminatory because they "treat[ed] Metro and non-Metro interests differently." [17] *Id.* at 737. One noted difference was the fact that these provisions did not impose fees upon disposals at NTTC or other Metropolitan-owned plants, but only upon waste disposed of at non-Metropolitan facilities. *Id.* The court further concluded that the district court did not abuse its discretion in granting a permanent injunction against the enforcement of Metropolitan's waste disposal fee provisions, as Metropolitan failed to "demonstrate that it had no other means of advancing a legitimate local interest," outside of the fee provisions. *Id.*

For these reasons, the court reversed the portion of the district court's order denying WMIT injunctive relief from enforcement of the flow control regulation,

and affirmed the segment of the order granting WMIT injunctive relief against the enforcement of the waste disposal fee provisions. *Id.* at 739.

 We reject appellants' argument that the tipping fees imposed by Metro constitute an illegal flow control device under *Waste Mgmt.* Flow control mechanisms, considered in the context of solid waste disposal, are devices implemented by a local or state government to require haulers to dispose of solid waste at government-approved waste facilities or within a specific geographic jurisdiction. If these mechanisms discriminate against interstate commerce "by treating in-state and out-of-state interests differently, benefitting the former and burdening the latter, it is per se invalid unless the State has 'no other means to advance a legitimate local interest.'" *Huish Detergents, Inc. v. Warren County, Kentucky,* 214 F.3d 707, 712–13 (6th Cir.2000) (quoting *C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 392, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994)).

We do not find that the tipping fees, as assessed by Metro under the circumstances of this particular case, qualify as flow control mechanisms. The tipping fees are not designed to force haulers in the Nashville, Davidson County area to strictly and exclusively dispose of collected waste at Thermal. Rather, these fees are assessed as a means of supplementing Metro's Solid Waste Disposal Fund by charging fees for refuse collected outside of the USD. Metro is not "hoarding" waste, nor is it trying to prevent the flow of waste into the USD from other states or geographic regions, specifically the GSD. Further, we find no evidence of any statute or

---

**17.** The court offered examples of such differential treatment, including the fact that the fee is only assessed against waste collectors who make disposals at waste facilities not owned by Metropolitan. *Id.*

ordinance, and are directed to no statute or ordinance, that requires haulers to dispose of residential solid waste collected in Davidson County, at a Metro-owned facility. Therefore, appellant's challenge to the application of tipping fees on the grounds that these fees are unlawful flow control mechanisms is unfounded.

Moreover, we recognize that the court in *Waste Mgmt.* impliedly noted in its assessment of Metropolitan's flow control regulation, that competitive tipping fees constituted an acceptable means of advancing the legitimate environmental and financial interests of the municipality. *Waste Mgmt.*, 130 F.3d at 736. On this basis, we are convinced that *Waste Mgmt.* does not stand for the position that tipping fees are illegal flow control mechanisms even when imposed separate and apart from an illegal flow control regulation.

This issue is therefore without merit.

### IV.

█ We next address the issue of whether the trial court erred in finding that Metro was immune from antitrust liability for the reason that it was acting under the authority of T.C.A. §§ 68–211–835 and 7–54–101 in imposing the tipping fees. The trial court's grant of summary judgment on this issue was further based on the conclusion that the Parker Immunity Doctrine applied under the circumstances at bar. While it is unclear whether appellants raised this issue on appeal, we will consider the issue for the reasons that it was cited as a cause of action in appellants' original petition, was expressly considered and decided by the trial court,

and was arguably included as part of appellants' brief to this Court via the following statement: "Recouping these tipping fees from their customers while attempting to compete against haulers who were not always charged a tipping fee by Metro created an unfair disadvantage to the Appellants."

In their response opposing Metro's Motion for Summary Judgment, appellants contend that Metro engaged in the restraint of trade, in violation of 15 U.S.C. §§ 1 and 2 ("Sherman Act") of the Federal Antitrust Act, through the imposition of tipping fees on GSD garbage haulers. Appellants' restraint of trade argument is best summarized in the following passage from their response:

> The Plaintiffs' affidavits [18] support the facts of how they were damaged due to the restraint of trade and the illegal taxing of the fee or tax. As a reminder to the Court, and as so stated in the affidavits, that Metro gave their contract haulers credit based upon weight or tonnage per residence, but in fact the residence did not generate that much tonnage or weight, and they commingled refuse collected in GSD but outside USD. With the garbage being commingled, the private haulers which were the Plaintiffs' competitors, did not have to pay any or as much to Metro so therefore, they charge a cheaper rate to the GSD residents outside USD causing the Plaintiffs to lose money when they had to pay the tax. This was a restraint of trade, unfair competition, and put Plaintiff Webster out of business and has

18. In his filed affidavit, Edwin Gray, President of Gray's, testified that the contracted haulers were commingling garbage collected from the USD and GSD districts without paying the same tipping fees assessed against appellants for the disposal of GSD waste. Gray further asserted that Metro's failure or refusal to impose a tipping fee on the contracted haulers resulted in unfair competition because these competitors could charge a smaller fee for their services as they did not have to account for the extra disposal charges. As a result, Gray testified that he was forced out of business.

forced Plaintiff Gray to seek financial relief.

Under 15 U.S.C. § 1, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1 (2002). Section 2 further provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony ...

15 U.S.C. § 2 (2002).

The Metropolitan Government of Nashville, Davidson County, Tennessee, is a municipality authorized to impose tipping fees upon the disposal of solid waste pursuant to T.C.A. § 68–211–835(a) and T.C.A. § 7–54–103(e)(1). Section 68–211–835(a) (Supp.2002) provides:

> Each county, municipality, or solid waste authority which owns a municipal solid waste disposal facility or incinerator may impose a tipping fee upon each ton of municipal solid waste or its volume equivalent received at such solid waste disposal facility or incinerator. Such a tipping fee shall be set by the governing body of the county or municipality, or by the board of directors of the solid waste authority. This tipping fee shall be collected by the operator of the publicly owned municipal solid waste disposal facility or incinerator and remitted to the owner. The fee imposed may be equal to, or a portion of, the estimated cost of providing solid waste management ser-

vices on a per ton or volume equivalent. Such full cost shall be determined pursuant to the uniform solid waste accounting system developed by the comptroller of the treasury.

Further authorization is granted under T.C.A. § 7–54–103(e)(1) (1998), which states:

> (e) A municipality is authorized to establish, levy, and collect fees, rates, or charges in connection with:
>
> > (1) The collection, delivery, sale, purchase, or disposal, whether at the site of an energy production facility, a landfill, or otherwise, of solid waste.

From the language of the statutes cited above, it is evident that Metro is authorized to impose and collect tipping fees upon the disposal of solid waste. We find no statutory language to suggest that the tipping fees are intended to create or function as a restraint of trade. Nor do we find that the private contracts entered into by Metro and the private USD haulers constitutes a contract in restraint of trade. The record contains no evidence that appellants were foreclosed from bidding on the USD collection routes. Further, there is no evidence of any kind that the publicly bid contracts allowed Metro to create a permanent, or even temporary, monopoly on the solid waste disposal industry. Although appellants suggest that they had no other option but to dispose of their collected waste at the Thermal plant as a result of the fact that there were no other disposal facilities nearby, we find no evidence to indicate that Metro required appellants to dispose of the waste at Thermal[19] after November 5, 1997—the date

---

**19.** In his affidavit, Edwin Gray testified that prior to the Sixth Circuit's 1997 decision in *Waste Mgmt., Inc. of Tennessee v. Metropolitan Government of Nashville and Davidson County,* 130 F.3d 731 (6th Cir.1997), he had "no

other choice by law," but to dispose of waste at a Metro-owned facility. However, we note that the *Waste Mgmt.* court suggested that the imposition of competitive tipping fees would have been a valid alternative to the flow con-

the *Waste Mgmt.* decision was filed injoining Metro's existing flow control regulation.

For the reasons above, and because appellants do not challenge the legality of the statutes authorizing the imposition of tipping fees on the disposal of solid waste, we find that Metro did not engage in the restraint of trade in violation of the Sherman Act. We affirm the trial court's grant of summary judgment in favor of Metro on this basis, and therefore need not address the issue of whether Metro was entitled to state action immunity under the Parker Immunity Doctrine.

## V.

The sole issue raised on appeal in case number 98–3400–II(III) is whether the trial court erred in granting summary judgment in favor of Metro. Pursuant to an Order entered December 6, 2001, the trial court found that:

> [N]o genuine issue of material fact exists as to the $66,979.80 in unpaid tipping fees incurred by Gray's Disposal Co., Inc. and as to the $55,275.00 in unpaid tipping fees incurred by Hermitage Hills Sanitary Company, and that Defendants owe said amounts to the Metropolitan Government.

Included among the above cited totals are tipping fees imposed by Metro against the respective appellants on disposals received prior to November 5, 1997. Specifically, we note that the $66,979.80 figure listed in the court's Order represents unpaid tipping fees incurred by Gray's after confirmation of its Chapter 11 bankruptcy plan on February 12, 1997. Therefore this figure includes tipping fees assessed against Gray's prior to November 5, 1997, and

pursuant to an illegal flow control regulation. A balance sheet for Webster was entered as an exhibit into the record. However, from our reading of the document, it is difficult to ascertain the precise percentage of the $55,275.00 debt listed in the court's Order above, that represents the amount Webster was charged in tipping fees from November 5, 1997 through December of 1997, the date of his last disposal at Thermal.

Appellants in this case contend that the tipping fees imposed as part of the flow control regulation that was enjoined by the Sixth Circuit as a violation of the United States Commerce Clause, are the illegal product of an unconstitutional regulation. Appellants, in denying liability for unpaid tipping fees imposed under this regulation, assert:

> During the period of time for which Appellants claim reimbursement and damages herein, the Appellants were subject to this same flow control. In addition to this, the Appellants did not own their own landfill such as Waste Management, but denying the Appellants the right to seek out cheaper locations to dispose of the refuse collected certainly threatened the well-being of their business interests.

> The Appellants submit that being subjected to the flow control measures, including the "tipping fee" violates the Commerce Clause of the U.S. Const. Art I, § 8, cl. 3 as described in *Waste Mgmt., Inc. of Tennessee v. Metro. Gov't of Nashville and Davidson County*, 130 F.3d 731 (6th Cir.1997).

Metro argues that statutory authorization existed as early as 1975, for the imposition

---

trol provisions instituted by Metro, for the advancement of legitimate local interests. *See id.* at 736. Based on this suggestion, we infer that the court would not have proposed

the tipping fee alternative had it considered such fees to be an illegal restraint of trade in violation of the Sherman Act.

of tipping fees on the disposal of solid waste at municipal waste incinerators. On this basis, Metro takes issue with appellants' attack on the "legality" of the tipping fees. While we do not dispute that such authority existed or exists to impose tipping fees on solid waste disposal, we do not analyze appellants argument as an attack on the legality of the tipping fees as a separate regulation. Rather, we analyze appellants position as an attack on the legality of the tipping fees as mandatory fees required as part of an unconstitutional flow control measure.

 To this extent, we find that the tipping fees imposed by Metro as a mandatory element of the adjudged illegal flow control regulation, are an unconstitutional violation of appellants' rights under the commerce clause. Appellants can not be held liable for the payment of fees, where such fees were imposed involuntarily upon appellants as a mandatory requirement of an illegal municipal regulation.

Our finding that the tipping fees, when imposed as a mandatory element of an illegal flow control regulation, violate appellants' commerce clause rights, is not inapposite of our holding that the tipping fees currently imposed by Metro do not infringe upon appellants' constitutional rights. The Sixth Circuit's decision in *Waste Mgmt.* clearly suggests that tipping fees are a valid alternative measure to flow control regulations. When such fees are imposed independently, rather than as an essential element of a flow control regulation, we find that tipping fees are a valid, legal solution for defraying the cost of solid waste disposal in the metropolitan area. On this basis, we hold that appellants remain liable for the payment of any unpaid tipping fees accumulated by the respective appellants after November 5, 1997.

We, therefore, vacate the trial court's grant of summary judgment in case number 98–3400–II(III). We remand this cause to the trial court for determination of the respective totals owing by each respective appellant for unpaid tipping fees accumulated after November 5, 1997. We affirm the order of the trial court granting summary judgment in case number 98–3317–III. Costs of the appeal are taxed one-half to appellant, Gray's Disposal Company, Inc., and Ray Webster d/b/a Hermitage Hills Sanitary Company and their surety, and one-half to appellee, Metropolitan Government of Nashville, Davidson County, Tennessee.